NORTHERN PAC. R. CO. v. HINCHMAN et al.

(Circuit Court, D. Montana. November 14, 1892.)

1. PUBLIC LANDS—RAILROAD GRANTS—LANDS EXCEPTED—"PUBLIC LANDS" DEFINED.
The lands in the Bitter Root valley above the Lo Lo Fork were not "public lands," such as could pass to the Northern Pacific Railroad by the grant expressed in the act of July 2, 1864, § 3, as of that date; for by the treaty of 1855 with the Flathead Indians it was provided that these lands should be surveyed and examined, and if, in the judgment of the president, they proved to be better adapted to the wants of the Flathead tribe than the general reservation therein provided, then such portions as were necessary should be set apart as a separate reservation for the tribe, and that they should not be open to settlement until the decision of the president was made known; and such decision was not made known until 1871, when the president decided not to make the lands a reservation.

2. SAME—PRIOR APPROPRIATION.
By the act of June 5, 1872, (17 St. at Large, 226,) these lands were excluded from the operation of the general pre-emption and homestead laws. Certain rights of pre-emption, without cost, were given to Indians actually occupying and cultivating any portion thereof. Special provisions were made as to the manner of selling the remainder to settlers, and a special account was directed to be kept of the proceeds, a portion of which was to be set aside and expended by the president for the benefit of the Indians. *Held*, that by this act these lands were reserved for a special purpose, so that they did not pass to the Northern Pacific Railroad Company on the subsequent filing of its plat of definite location, although they were within the limits of the grant.

3. SAME.
This reservation by congress of the land in question was not in violation of any contract rights acquired by the railroad company under the grant, for the grant only attached, on the definite location of the road, to lands to which the United States had "full title, not reserved, sold, granted, or otherwise appropriated."

4. SAME—WITHDRAWAL FROM SALE, ETC.
Section 6 of the granting act, which directs the president to cause the lands to be surveyed for 40 miles in width, on both sides of the entire line, "after the general route shall be fixed," and declares that the odd sections granted shall not be liable to "sale or entry or pre-emption before or after they are surveyed, except by said company, as provided by this act," did not operate to reserve or withdraw such lands from sale or other disposition by the government before the filing of the map of definite location with the commissioner of the general land office. Railroad Co. v. Sanders, 46 Fed. Rep. 239, 47 Fed. Rep. 604, followed.

5. SAME.
Even if it be conceded that this reservation or withdrawal could operate at the time the "general route" was fixed, the reservation was only from "sale or entry or pre-emption," and these terms do not include such an appropriation as was made by the act of 1872.

6. SAME.
The fact that in 1874 an act was passed extending the homestead law to all settlers on these lands who might desire to take advantage thereof did not take the lands from the special appropriation made by the act of 1872, and restore them to the same condition as the mass of the public domain, so as to make the grant attach thereto on the subsequent fixing of the definite route by the filing of the plat thereof with the commissioner of the general land office.

At Law. Action in ejectment, brought by the Northern Pacific Railroad Company against James R. Hinchman and others. Tried to the court on an agreed statement. Judgment for defendants.

F. M. Dudley and W. E. Cullen, for plaintiff.
Leslie & Craven, for defendants.

KNOWLES, District Judge. This is an action in the nature of ejectment, brought by plaintiff to recover of defendant and others the possession of certain lands in the Bitter Root valley, Mont., described as section 11 N., range 20 W., in the county of Missoula, territory of Montana. Since the commencement of this suit, Montana has become a state in the Union. The case was submitted to the court upon an agreed statement of facts. From this it sufficiently appears that plaintiff received a grant to the premises in dispute, unless it is by some operation of law excluded therefrom. It is within 40 miles of the line of the railroad route of plaintiff as located, built, and accepted, and is an odd section. It also appears that defendant settled upon 160 acres of said section on the 3d day of October, 1884, claiming the same as a homestead; that he improved it, and on December 5, 1887, made his final proofs, and pre-empted the same, and on the 6th day of November, 1889, he received a patent to the same from the United States.

It is also agreed that the Flathead Indians made a treaty with the United States in 1855 in regard to their lands, which treaty was ratified by the senate, March 8, 1859; that the lands in the Bitter Root valley above the Lo Lo Fork, among which are situated the lands in dispute, had been carefully surveyed before 1871, and the president had decided that the same had proved not to be better adapted to the wants of the Flathead tribe than the general reservation provided for in said treaty, and had issued an order to that effect on November 14, 1871. In that order it was provided that any Indians residing in the Bitter Root valley who desired to become citizens and reside upon the land which they then occupied, not exceeding in quantity what is allowed under the homestead and pre-emption laws to all citizens, should be permitted to remain in said valley upon making known to the superintendent of Indian affairs for Montana territory, by the 1st day of January, 1873, their intention to comply with these conditions. In the above order referred to there was a provision that said Indians should be removed to the general reservation provided therefor.

It was also agreed that from the time of making said treaty the Indians continued to occupy and claim the lands in the Bitter Root valley, and were so occupying and claiming at the time of said order of the president, November 14, 1871, and that they continued in possession and claimed and were there in August, 1872, and one of their chiefs, Charlot, is yet there, with several hundred Indians under him.

It is also agreed that since June, 1872, in pursuance of the act of congress of the 5th of that month, there had been issued 54 patents for parts of said Bitter Root lands above Lo Lo Fork to various ones of said Indians, and 3,240 acres of the said lands covered by these patents are within odd sections, and within 40 miles of said road, and are yet in the possession of and claimed by said Indians. That said Indians, however, have refused to accept said patents for fear of

severing their tribal relations; that Charlot, the chief of said Indians, lives upon one section of said land, and has done so since 1855.

It is also agreed that there is no claim on the part of the Indians residing in the Bitter Root valley that the same or any part thereof is an Indian reservation, or that the Flathead tribe, to which they belong, has never parted with the Indian title thereto; nor is the tract in controversy claimed by any of said Indians; nor was it so claimed by any of them at the date of the filing of the map of the definite location of plaintiff's road, or at the date of the entry thereof by defendant; nor was the said tract of land embraced in any of the patents mentioned above as having been issued to, but not accepted by, said Indians.

The third section of the act incorporating plaintiff, and making a grant of land to it, provides—

"That there be, and hereby is, granted to the Northern Pacific Railroad Company, its successors and assigns, for the purpose of aiding in the construction of said railroad and telegraph line to the Pacific coast, and to secure the safe and speedy transportation of the mails, troops, munitions of war, and public stores over the route of said line of railway, every alternate section of public land, not mineral, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of said railroad line, as said company may adopt, through the territories of the United States, and ten alternate sections of land per mile on each side of said railroad, wherever it passes through any state, and whenever, on the line thereof, the United States have full title not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

The treaty above referred to with the Flatheads contained this section:

"It is moreover provided that the Bitter Root valley, above the Lo Lo Fork, shall be carefully surveyed and examined, and if it shall prove, in the judgment of the president, to be better adapted to the wants of the Flathead tribe than the general reservation provided for in this treaty, then such portions of it as may be necessary shall be set apart as a separate reservation for said tribe. No portion of the Bitter Root valley above the Lo Lo Fork shall be opened to settlement until said examination is had, and the decision of the president made known."

As above stated, this survey was made, and in 1871 the president decided not to make said lands a "reservation for said Indians." From these facts it is evident that these lands never were embraced in what is termed an "Indian Reservation." They were public lands, which, by the terms of the treaty with the Indians named, the president might devote to such a reservation. In the case of Phelps v. Northern Pac. R. Co., reported in 1 Dec. Dep. Int. 384, Secretary Teller, of the interior department, rendered a decision upon the very point at issue in this case, and held that these lands in the Bitter Root valley did not pass to plaintiff in its grant. He bases his decision upon the ground, in part, that the lands were at the time of the grant to said company reserved, and adopts this language from the case of Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733: "Every tract set apart for special uses is reserved to the government to enable it to enforce them." There are other declarations in this same opinion last named which appear to me to have a great bearing upon the

point here presented. The grant to plaintiff was of "public lands." The meaning of these terms is very important in considering this question. Have they a defined meaning in the legislation of congress concerning the public domain? In that decision, upon this point, the supreme court said:

"But only public lands owned absolutely by the United States are subject to survey and division into sections, and to them alone this grant is applicable. It embraces such as could be sold and enjoyed, and not those which the Indians, pursuant to treaty stipulations, were left free to occupy."

The court here was considering a railroad grant, which contained the term "public lands," and those transferred to the railroad company. Again:

"Since the land system was inaugurated it has been the settled policy of the government to sell the public lands at a small cost to individuals, and for the last 25 years to grant them to states in large tracts, to aid in work of internal improvement. But these grants have always been recognized as attaching only to so much of the public domain as was subject to sale or other disposal, although the roads of many subsidized companies passed through Indian reservations."

In the case of Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. Rep. 856, the supreme court again reviewed this question. In the opinion, Justice Field, speaking for the court, said in relation of the very grant under consideration:

"The grant is of alternate sections of public land, and by 'public land,' as it has been long settled, is meant such land as is open to sale or other disposition, under general laws. All land to which any claims or rights of others have attached does not fall within the designation of public lands."

Again, that distinguished justice, referring to the fact that he, with other members of the supreme court, had dissented from the decision in the Leavenworth Case, supra, said:

"And this writer, after a much larger experience in the consideration of public land grants since that time, now readily conceded that the rule of construction adopted, that, in the absence of any express provision indicating otherwise, a grant of public lands only applies to lands which are at the time free from existing claims, is better and safer, both for the government and to private parties, than the rule which would pass property subject to the liens and claims of others. The latter construction would open a wide field of litigation between the grantees and third parties."

In the case of Newhall v. Sanger, 92 U. S. 761, the supreme court said the words "public lands" are habitually used in our legislation to describe such as are subject to sale or other disposal, under general laws. The conclusion reached by these decisions is that only such lands as are public lands at the date of the grant, the same being one in praesenti, pass to the company; and that all lands which are not subject to disposal, under the general laws of congress, are not public lands; and that lands to which any claim or right has attached are not subject to such disposal as long as it exists.

In this case the lands of the Bitter Root valley were, by treaty with the Flathead Indians, reserved from settlement, and consequently from sale or disposal, under the general pre-emption or homestead laws. If they could not be settled upon, they would not come within such laws. Then the Flathead Indians were allowed to

occupy such lands until the president should determine whether or not they were better adapted than the general reservation provided for in the treaty for a reservation for such particular Indians. It should be stated, perhaps, that the treaty here referred to was not one entered into alone by the Flathead Indians, but by them and two other tribes. The general reservation was one for all these tribes. It is evident, and I may say a matter of public knowledge or history, that the Flathead Indians desired a separate reservation for themselves in the Bitter Root valley, and whether they should have this was left to the determination of the president by the terms of the treaty. What would be the fate of this section was left in suspension, awaiting this action of the president, under the treaty, and it was in this condition when the grant to plaintiff was made in 1864. It was not until 1871 that the president made his decision, and these lands thrown open to general settlement. In the light of these decisions, it can hardly be maintained, under the facts presented, that these lands in the Bitter Root valley were what is termed "public lands" at the date of the grant to the plaintiff. They did not, therefore, pass to plaintiff thereby. It is claimed that the decision of the supreme court in Buttz v. Railroad Co., 119 U. S. 55, 7 Sup. Ct. Rep. 100, is against this view. In the case of Bardon v. Railroad Co., supra, the supreme court distinguishes that case from one like this. In that the land was a part of what is termed, generally, "Indian Country." The Indians had the general right of occupancy upon the same, not by virtue of any treaty with them, or on account of any legal obligation entered into by the United States, but in accordance with a general rule or usage, which has for years been acquiesced in or conceded. And then the law itself, making the grant, contemplated that these lands should pass, as it entered into a stipulation or agreement therein to extinguish this right of occupancy for the benefit of plaintiff. When this was done, the land would become subject to sale and pre-emption and entry, under the general laws of congress. In this case, however, the land had been placed in a condition in which an Indian reservation might be created out of them by the action of the president. If a reservation should be created out of them, the Indians would not occupy them by virtue of the general right of occupancy, conceded to be in them, but by virtue of a treaty with the United States, which would have the force and effect of a law. It is evident the above stipulation did not apply to lands incumbered as these were by this treaty. If so, the law would, in effect, abrogate that provision of the treaty which left it in the power of the president to establish a reservation out of these lands. How could both stand? By one, the president would have the right to establish a reservation which, according to the decision in the Leavenworth Case, supra, would exclude the land from plaintiff's grant; by the other, the government was pledged to cancel this right to have a reservation established, and bring the lands within the terms of the plaintiff's grant.

There is, however, another point presented in this case for consideration, which leads me to as satisfactory a conclusion, and, per-

haps, a more satisfactory one, in regard to this case, than the one just considered. On the 5th day of June, 1872, congress enacted a statute in relation to the Bitter Root lands, a part of which is as follows:

"Sec. 2. That, as soon as practicable after the passage of this act, the surveyor general of Montana territory shall cause to be surveyed, as other public lands of the United States are surveyed, the lands in the Bitter Root valley lying above the Lo Lo Fork of the Bitter Root river, and said lands shall be opened to settlement, and shall be sold in legal subdivisions to actual settlers only,—the same being citizens of the United States, or having declared their intention to become such citizens, said citizens being heads of families over twenty-one years of age,—in quantities not exceeding one hundred and sixty acres to each settler, at the price of one dollar and twenty-five cents per acre, payment to be made in cash within twenty-one months of date of settlement or of the passage of this act. The sixteenth and thirty-sixth sections of said lands shall be reserved for school purposes, in the manner provided by law. Townsites in said valley may be reserved and entered as provided by law: provided, that no more than fifteen townships of the lands so surveyed shall be deemed to be subject to the provisions of this act: and provided, further, that none of the lands in said valley, above the Lo Lo Fork, shall be open to settlement under the homestead and pre-emption laws of the United States. An account shall be kept by the secretary of the interior of the proceeds of said lands, and out of the first moneys arising therefrom there shall be reserved and set apart for the use of said Indians the sum of fifty thousand dollars, to be by the president expended in annual installments, in such manner as, in his judgment, shall be for the best good of said Indians, but no more than five thousand dollars shall be expended in any one year."

The third section of said act provides that any of said Indians who shall, at the passage of the act, be actually living upon and cultivating any portion of said lands, could pre-empt the same, without cost, to the extent of 160 acres. 17 St. U. S. p. 226. This law, as we have seen, excluded these lands from the operation of the pre-emption and homestead laws. All the lands, odd and even sections, are to be sold to actual settlers. The improvements required under the provisions of section 2259 of the Revised Statutes are not necessary. The oath prescribed in section 2262 of said statutes is not necessary. The time for the payment of the purchase price is different from that made under the pre-emption law. Many differences between this and the pre-emption laws might be noted. The Indians actually living upon any piece of land, not exceeeding 160 acres, might purchase the same without payment of the price of $1.25 per acre. This right was not confined to even sections. The sale of these lands was to be a matter of a special account to be kept by the secretary of the interior, and the money derived from these sales, to the amount of $50,000, was to be paid to the Indians. In view of all these matters, it is apparent that by this statute these lands were appropriated to a particular purpose, and one which was inconsistent with any grant of the same to the Northern Pacific Railroad Company. The Indians, it is agreed, availed themselves of the provisions of this act, and claimed land under the same, and land upon odd sections, to the amount of 3,240 acres, and patents have been issued to them therefor, under and by virtue of an act of congress, entitled "An act to provide for the sale of lands patented to certain members of the Flathead band of Indians, in Montana territory, and for other purposes," approved March 2, 1889, (25 St. U. S. p. 871.) It has been

provided that those very lands, with others, shall be sold, and a clear title thereto given to the purchasers, and the proceeds paid to the particular Indians to whom such patent has issued. The practice in the land department, and this subsequent act of congress, show clearly the intent of congress in passing the act of June 5, 1872, and that it was to devote these lands to a particular object.

The question is here presented, could congress do this? Could it divert lands within the limits of plaintiff's grant to another purpose, admitting that they were public lands, and subject to the grant at the date thereof? Plaintiff urges that congress had no such power; that the grant to plaintiff was in the nature of a contract, which, when accepted and complied with, could not be abrogated. Let this be conceded. First let us examine as to the nature of this contract. In it there is this provision, after the general terms of the grant:

"And whenever, on the line thereof, the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights at the time the line of said road is definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office."

As the land belongs to the government, no one could reserve, sell, grant, or otherwise appropriate any of the lands within the limits of plaintiff's grant but the government. If any of the lands are sold, granted, or otherwise appropriated at the time of the definite location of the road, and the filing of a plat thereof in the office of the commissioner of the general land office, they do not pass to the railroad company.

This view is sustained in Railway Co. v. Dunmeyer, 113 U. S. 629, 5 Sup. Ct. Rep. 566. It is evident, then, that in the very grant to plaintiff the right was reserved to the government to reserve, sell, grant, or otherwise appropriate any of the lands which might fall within the limits of the same, up to the time of the definite location of plaintiff's road, and the filing of a proper plat of the same. It is not necessary to go into a full discussion of the nature of plaintiff's grant. The supreme court, in recent decisions, has defined this sufficiently. It was a grant in praesenti, in the nature of a float, which remained so until its road was definitely fixed, and a plat thereof filed in the office of the commissioner of the general land office. When that was done, the grant received precision, and the rights of the plaintiff became vested. It is not consistent with any reasonable intention on the part of congress that, in making the grant to plaintiff, it, during the time the same was a float, should debar itself of making any disposition of any kind of any lands which might fall within the limits of plaintiff's grant. The language of the grant would clearly indicate otherwise, and the practice of the government has been otherwise. There has been no dispute up to this time, but, until the general route of the road was established, these lands, which finally fell within the limits of plaintiff's grant, were subject to such disposal, and to pre-emption and to homestead claims. Subsequent portions of the act provide for giving lieu lands in place of those which might be disposed of in any way, or be made

subject to pre-emption or other claims or rights, up to the final location of the route of plaintiff's road.

Plaintiff seems to claim that the sixth section of said act should be considered in this matter. The portion claimed to have a bearing upon this question is as follows:

"That the president of the United States shall cause the lands to be surveyed for forty miles in width, on both sides of the entire line of said road after the general route shall be fixed; and the odd sections hereby granted shall not be liable to sale or entry, or pre-emption before or after they are surveyed, except by said company, as provided in this act."

I have heretofore placed my construction upon this section in the case of Railroad Co. v. Sanders, 46 Fed. Rep. 239, 47 Fed. Rep. 604. Up to this time I have had no occasion to change the views there expressed. I still cannot comprehend how, when the statute describes, as reserved from sale, entry, or pre-emption, lands granted, the reservation can attach to any specific lands until the lands granted are designated or known. If there is ambiguity to be found in the language used, it must be construed against the claims of plaintiff. But for the purposes of this case let the contention prevail, and the reservation here provided for applies to the odd sections of land found within the limits of 40 miles on each side of the general route of plaintiff's road as fixed, without any reference as to whether they should turn out to be granted lands or not. It will be seen the terms of the section are "sale," "entry," and "pre-emption." These have a determined meaning. Railroad Co. v. Dunmeyer, supra. In the above case of Railroad Co. v. Sanders, supra, this court took occasion to consider these terms, and found that, under the decisions of the supreme court, they applied to the sale, pre-emption, and entry of lands under and by virtue of the general laws of congress. Lands may be devoted to purposes which would not work a disposal of the same under any of these terms. The establishment of a military reservation or an Indian reservation, or the disposal of a portion of the same, as in this case, to raise a fund with which to settle a dispute with Indians, and preserve the peace of the country, would not be prohibited by any of these terms. This view is supported, also, by the case of Railroad Co. v. Dunmeyer, supra. In that case there was presented a statute which had reserved from pre-emption, private entry, and sale on the general line of the road of that company the lands within certain boundaries. Subsequently this statute was amended, and the words "pre-emption" and "private entry" were omitted. The court held that the reservation in this amended act could apply only to a sale of the property under the general laws, and did not apply to a disposal of them under the pre-emption or homestead statutes; in other words, the reservation could not be made to cover any other mode of disposal of the public lands than that named therein.

The fact that in 1874 congress passed an act which extended to all settlers on said lands who might desire to take advantage of the same (the homestead act) would not have the effect to take them from the special appropriation thereof, and restore the same to the same condition as the mass of the public domain. I do not know

what interpretation the land department has given to this act. I think it might be limited to settlers upon these lands at the date of the passage of the act. But the determination of this point is not at all necessary in this case. Whatever interpretation might be put upon it, the lands still remain subject to the provisions of the statute of June 5, 1872, and any portion of the same was subject to be sold at $1.25 per acre, and the proceeds devoted to this special fund. It might be that none of these lands would be taken under the homestead act. Until they should be so taken, that statute of June 6th covered and appropriated them. The fact of taking any portion of said lands as a homestead would not certainly have the effect of restoring the same to the same condition as the mass of the public domain. In the case of Turner v. Missionary Union, 5 McLean, 344, it was held that the devoting of lands to be sold for the benefit of certain Indians—that is, the proceeds of the sale were to be given to them—was an appropriation of such lands, and withdrew them from general location and pre-emption rights.

I find, after some consideration of this matter, that the land upon which defendant made his settlement, and which is in dispute herein, with others, was appropriated by an act of congress to another purpose than that of building, or aiding in building, plaintiff's road; that congress, under the terms of the grant to plaintiff, had the right to do this, and violated no contract with plaintiff by so doing; that this appropriation to the special purpose named existed when the definite route of said road was fixed, and a plat thereof filed with the commissioner of the general land office, and hence did not pass to plaintiff, and it had no title to the same at the commencement of this action. This conclusion, with the one that the lands were not public lands at the date of the grant to plaintiff, and hence did not, for that reason, pass to plaintiff, warrants me in finding for defendant. I therefore order that judgment be entered against plaintiff and for defendant; that he is entitled to the possession of the premises described in his answer; and for his costs in this action expended.