## NORTHERN PAC. R. CO. v. MACLAY et al.

(Circuit Court of Appeals, Ninth Circuit. April 2, 1894.)

### No. 88.

PUBLIC LANDS—RAILROAD GRANTS—RESERVED LANDS.

> The lands lying in the Bitter Root valley, Mont., above the Lo Lo fork, having been reserved from sale or other disposition until the president should decide whether they should be set aside as a reservation for the Flathead Indians (Treaty of July 16, 1855), were not public lands, and were therefore incapable of passing to the Northern Pacific Railroad Company under the act of July 2, 1864, which was a grant in praesenti, and could never attach to any lands that were not public at that date, though they were afterwards made public by the president's decision.

·. In Error to the Circuit Court of the United States for the District of Montana.

This was an action in the nature of ejectment brought by the .Northern Pacific Railroad Company against Samuel Maclay and others. The circuit court rendered judgment for defendants, and plaintiff sued out this writ of error.

This is an action in the nature of ejectment, brought by plaintiff in error to recover from defendants in' error the S. ½ of the S. ½ of section 11, township 11 N., range 20 W., in the Bitter Root valley, Mont. The facts, · as agreed upon by counsel, are as follows:

"That the Northern Pacific Railroad Company is a corporation created by, and existing under, an act of congress of the United States entitled 'An act granting lands to aid in the construction of a railroad and telegraph line from Lake Su:.erior ·to Puget sound, on the Pacific coast, by the northern route,' approved July 2, 1864. That the said railroad company duly accepted · the terms, conditions, and impositions of said act of July 2, 1864, within two · years after the approval thereof, and duly served such acceptance upon the president of the United States. That by the third section of said act there was granted to said plaintiff by congress every alternate section of public land, not mineral, designated by odd numbers, to the amount of 20 alternate sections per mile on each side of such line as said plaintiff should adopt, through the territories of the United States, and whenever on the line thereof the United States have full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, at the time the. line of said road is' definitely fixed, and a plat thereof filed in the office · of the commissioner of the general land office. And that by the sixth section

of said act it was provided that the president of the United States shall cause the lands to be surveyed for 40 miles in width on both sides of the entire line of said road after the general route shall be fixed, and as fast as may be required by the construction of said railroad, and odd sections of land hereby granted shall not be liable to sale or entry or pre-emption before or after they are surveyed, except by said company, as provided in this act. That plaintiff duly fixed the line of general route of its said road extending through the territory of Montana, February 21, 1872. That the lands described in said complaint were on and within 40 miles of the line of general route so fixed. That thereafter, to wit, on the 22d day of April, 1872, the commissioner of the general land office, under the direction of the secretary of the interior, ordered the odd-numbered sections of land on and within 40 miles of said road to be withdrawn from sale, entry, or pre-emption, and that a copy of said order was duly received at the United States district land office at Helena, Montana, on the 6th day of May, 1872. That the lands described in said complaint were within the limits of the said United States land district. That thereafter, to wit, on the 6th day of July, 1882, the line of said railroad was definitely fixed by said plaintiff, and a plat thereof filed in the office of the commissioner of the general land office, and that said premises were on, and within 40 miles of, the line of said road so definitely fixed as aforesaid. That said premises are agricultural land, and not mineral in character. That prior to the 27th day of August, 1883, the said plaintiff had duly completed its said road on, over, and along said line of definite location, as fixed as aforesaid, as required by said act of congress. That three commissioners were duly appointed by the president of the United States to examine said line, and said commissioners duly reported to the president that said railroad and telegraph line had been completed in a good, substantial, and workmanlike manner, as in all respects required by said act, and on the 27th day of August, 1883, said railroad and telegraph line were duly approved and accepted by the president of the United States. That said premises are part of the land situated in the Bitter Root valley mentioned in the treaty made with the Flathead Indians, July 16, 1855, and ratified by the senate March 8, 1859, and are above the Lo Lo fork.[1] That prior to November 14, 1871, the lands in the Bitter Root valley, above the Lo Lo fork, were carefully surveyed and examined, as provided in article 11 of said treaty, and that the lands described in said complaint were a portion of the lands so surveyed and examined, and to which reference was had in article 11 of said treaty, and that on said date, to wit, November 14, 1871, the president of the United States issued his proclamation as follows, to wit:

"'Executive Mansion, November 14, 1871.

"'The Bitter Root valley, above the Lo Lo fork, in the territory of Montana, having been carefully surveyed and examined, in accordance with the eleventh article of the treaty of July 16, 1855, concluded at Hell Gate, in the Bitter Root valley, between the United States and the Flathead, Kootenay, and Upper Pend d'Oreilles Indians, which was ratified by the senate March 8, 1859, has proved, in the judgment of the president, not to be better adapted to the wants of the Flathead tribe than the general reservation provided for in said treaty. It is therefore deemed unnecessary to set apart any portion of said Bitter Root valley as a separate reservation for Indians referred to in said treaty. It is therefore ordered and directed that all Indians residing in said Bitter Root valley be removed, as soon as practicable, to the reservation provided for in the second article of said treaty, and that a just and impartial appraisement be made of any substantial improvements made by said Indians upon any lands of the Bitter Root valley, such as fields in-

---

[1] The treaty has the following provision in respect to these lands: Article 11 thereof provided: "It is, moreover, provided that the Bitter Root valley, above the Lo Lo fork, shall be carefully surveyed and examined, and if it shall prove, in the judgment of the president, to be better adapted to the wants of the Flathead tribe than the general reservation provided for in this treaty, then such portions of it as may be necessary shall be set apart as a separate reservation for the said tribes. No portion of the Bitter Root valley above the Lo Lo fork shall be opened to settlement until such examination is had and the decision of the president made known."

closed and cultivated, and houses erected; that such appraisement shall distinguish between improvements made before the date of said treaty and such as have been subsequently made. It is further ordered that, after the removal herein directed shall have been made, the Bitter Root valley aforesaid shall be open to settlement. It is further ordered that if any of said Indians residing in the Bitter Root valley desire to become citizens, and reside upon the lands which they now occupy, not exceeding in quantity what is allowed under the homestead and pre-emption laws to all citizens, such persons shall be permitted to remain in said valley, upon making known to the superintendent of Indian affairs for Montana territory, by the 1st day of January, 1873, their intention to comply with these conditions.

'"U. S. Grant.'

"That on February 21, 1872, and on July 6, 1882, said land was public land, to which the United States had full title, not reserved, sold, granted, or otherwise appropriated, and free from pre-emption or other claims or rights, except as herein set forth. That from the time of making the treaty, in July, 1855, the Indians continued to occupy and claim the land in the Bitter Root valley as Indian lands, and were so occupying and claiming them on November 14, 1871, when the president's proclamation aforesaid was issued, and continued to occupy said lands in the Bitter Root valley, roaming thereover, and claiming the same as Indian country, but not asserting claim thereto in severalty, on February 21, April 22, and May 6, 1872. That they continued in possession and claim as aforesaid, and were there in August, 1872, and one of their chiefs (Charlot) is yet there, with several hundreds of Indians under him. That since June, 1872, in pursuance to the act of congress, June 5, 1872, there have been issued 54 patents for parts of said Bitter Root lands above Lo Lo fork to various ones of said Indians; and 3,240 acres of the lands covered by those patents are within odd sections, and within 40 miles of said road, and are yet in the possession of, and claimed by, said Indians. That they never have accepted said patents, but refused to do so. That on the 3d day of October, 1884, said James R. Hinchman made a filing upon, and took possession of, the land (160 acres) described, and is the land in dispute in this suit, to wit, the south half of the south half, section eleven, T. 11, R. 20 W. That he settled upon it with his family on that day, claiming it as his homestead. That said land is of the value of over five thousand dollars. That he lived upon it, and improved and occupied the same, and made his final proof, showing his pre-emption right, December 5, 1887, and on the 6th day of November, 1889, the same was patented to him from the United States, and the same was being held, possessed, and claimed under that patent at the time this suit was brought. That Chief Charlot lives upon, claims, and occupies one odd section of said Bitter Root lands, and has done so ever since 1855."

F. M. Dudley and J. B. McNamee, for plaintiff in error.
Leslie & Craven and S. G. Murray, for defendants in error.

Before McKENNA and GILBERT, Circuit Judges, and HAWLEY, District Judge.

HAWLEY, District Judge (after stating the facts). From the agreed statement of facts, it affirmatively appears that the lands in question, in the Bitter Root valley, above the Lo Lo fork, in the state of Montana, were not public lands of the United States at the date of the passage of the "Act granting lands to aid in the construction of a railroad and telegraph line from Lake Superior to Puget Sound on the Pacific coast by the northern route, approved July 2, 1864." And from the decisions of the supreme court of the United States in Wilcox v. Jackson, 13 Pet. 498; Leavenworth, L. & G. R. Co. v. U. S., 92 U. S. 733; Newhall v. Sanger, Id. 761; Bardon v. Railroad Co., 145 U. S. 535, 12 Sup. Ct. 856; of this

court in Amacker v. Railroad Co., 7 C. C. A. 518, 58 Fed. 851; and of the land office in Phelps v. Railroad Co., 1 Dec. Dep. Int. 384,—it is manifest that the act of congress granting lands to the railroad does not convey, and was not intended to convey, any lands that were not, at the time of the passage of the act, public lands of the United States. In Bardon v. Railroad Co., supra, the court, in interpreting the grant under consideration, said:

"The grant is of alternate sections of public land, and by 'public land,' as it has been long settled, is meant such land as is open to sale or other disposition under general laws. All land to which any claims or rights of others have attached does not fall within the designation of 'public land.'"

Mr. Justice Field, who delivered the opinion of the court, after referring to the Leavenworth Case, and to the fact that he had dissented from the opinion in that case, said:

"But the decision has been uniformly adhered to since its announcement; and this writer, after a much larger experience in the consideration of public land grants since that time, now readily concedes that the rule of construction adopted—that, in the absence of any express provision indicating otherwise, a grant of public lands only applies to lands which are at the time free from existing claims—is better and safer, both to the government and to private parties, than the rule which would pass the property subject to the liens and claims of others. The latter construction would open a wide field of litigation between the grantees and third parties."

In Amacker v. Railroad Co., supra, this court, with reference to the same grant, said:

"The character of the grant to the company is well defined. It is one in praesenti, but, as was said in St. Paul & P. R. Co. v. Northern Pac. R. Co., 139 U. S. 1, 11 Sup. Ct. 389: 'The grant was in the nature of a float, and the title did not attach to any specific sections until they were capable of identification; but, when once identified, the title attached to them as of the date of the grant, except as to such sections as were specifically reserved.' In considering, therefore, what lands ultimately passed by the grant, there are two periods principally to be regarded: One, the date of the granting act; the other, the filing of the map of definite location of the road. Lands to which claims had attached at either period did not pass, though they were free from the claim at the other period."

The judgment of the circuit court is affirmed.