REAGAN, APPELLANT, v. BOYD, RESPONDENT,

(No. 4,318.)

(Submitted March 12, 1921. Decided April 11, 1921.)

[197 Pac. 832.]

*Quieting Title—Public Lands—Price Per Acre—Statutes—Construction—General and Special Statutes.*

Public Lands—Decisions of Land Department—Review by Courts.

1. While the decision of the federal land department upon a question of fact in determining conflicting claims arising over public lands, in the absence of fraud is conclusive upon the courts, its construction of the law is not binding when called in question in a proper judicial proceeding.

Same—Price—Statutes—Construction.

2. By Article XI of the Treaty of 1855 with the Flathead Indians certain lands in the Bitter Root Valley, Montana, were tentatively set apart for Indian reservation purposes. By Act of July 2, 1864 (13 Stat. 765), every alternate section of public land along the line of the Northern Pacific Railroad not reserved was granted to the company. Section 2357, United States Revised Statutes of 1873 and 1878 (being a compilation of previous Acts fixing the price of public land per acre), fixed the price at $1.25, and, by a proviso, the price of land for the alternate sections not granted to railroads, at $2.50 per acre. By Act of June 5, 1872 (17 Stat. 226), fifteen townships of the land reserved for Indian purposes by the Treaty of 1855 were thrown open to entry at $1.25 per acre. In 1908 defendant's predecessor made entry of a tract of land embraced within the boundaries of the fifteen townships, paid $1.25 per acre, and received a receiver's certificate. This entry was canceled by the commissioner of the general land office because of the refusal of the entryman to pay $1.25 additional, he holding that the price fixed by the proviso in section 2357 and not that fixed by the Act of 1872 was controlling. *Held,* in an action to quiet title by the successor of the second entryman, who paid $2.50 per acre for the land and received patent, that since none of the land set apart by the treaty for Indian uses passed by the grant to the railroad company, there were no alternate sections within the tract to which the minimum price of $2.50 per acre fixed by the proviso in section 2357 could apply, that therefore the price of $1.25 fixed by the Act of 1872 was controlling, and hence that the ruling of the commissioner of the land office was erroneous and the judgment of the district court in favor of defendant correct.

General and Special Statutes—Construction.

3. Where a statute deals with a subject in general and comprehensive terms and another deals with a part of the same subject in a more minute and definite way, the latter will prevail over the former to the extent of any necessary repugnancy between them, as it will also where it is enacted later than the general one, in which event it will be regarded as an exception to or qualification of the prior general Act.

Public Lands—Patent—Legal Title—Trusts.

    4. Where a person has wrongfully received patent to lands which in equity and good conscience should have been granted to another, the patentee and those holding under him with knowledge of the facts will be converted into trustees of the legal title for the use and benefit of the equitable owner and required to make an appropriate transfer to him.

*Appeal from District Court, Ravalli County; R. Lee Mc-Culloch, Judge.*

ACTION by Thomas B. Reagan against J. E. Boyd. Judgment for defendant; plaintiff appeals. *Affirmed.*

Cause submitted on briefs of Counsel.

*Mr. J. D. Taylor,* for Appellant.

The Department of the Interior, in *Hollensteiner's Case,* 38 Land Dec. 319, reviews all the Acts of Congress relative to the sale and disposal of government lands in the Bitter Root Valley, and holds that the lands in controversy should be sold for $2.50 per acre instead of $1.25. (See, also, *United States* v. *Healey,* 160 U. S. 136, 40 L. Ed. 369, 16 Sup. Ct. Rep. 247; *United States* v. *Ingram,* 172 U. S. 327, 43 L. Ed. 465, 19 Sup. Ct. Rep. 177 [see, also, Rose's U. S. Notes].) It is apparent that the supreme court of the United States would be compelled, by force of the decisions in the *Healey-Ingram Cases,* to hold that the selling price of the land in question would be $2.50, if within the limits of a railroad grant, and as the respondent by his pleadings does not disclose that the land is not within the limits of a railroad grant, it is defective, and the demurrer should have been sustained. Appellant further contends that the respondent is not the successor in interest of Elmer L. Darling and is not in a position to attack the appellant's patent on any ground. The pleading discloses that he claims by virtue of a sheriff's certificate and deed under foreclosure. (*Thomas* v. *Horst,* 54 Mont. 260, 169 Pac. 731.)

*Messrs. O'Hara & Madeen,* for Respondent.

Section 2357 of the United States Revised Statutes (sec. 4557, U. S. Comp. Stats. 1916), provides generally that the price of public lands shall be $1.25 per acre, with the exception

"that the price to be paid for alternate reserved lands, along the line of railroads within the limits granted by any Act of Congress, shall be $2.50 per acre." The exception has to do with the alternate section. What can be fairly meant by "alternate reserved lands?" Bearing in mind that the government granted to the Northern Pacific Railway Company all of the odd-numbered sections within forty miles of its road, the language becomes very plain, and can only refer to those lands where every other section is covered by the grant, and not to all sections that, from any cause, might be excluded in a body, even though within the forty-mile limit. It has been held by the Department of the Interior that the lands in the Bitter Root Valley did not pass to the Northern Pacific Railway Company by its grant (*Phelps* v. *Northern Pac. Ry. Co.,* 1 Dec. Dept. Int. 384), and this case has been followed by the issuance of patents for practically all of the land in the Bitter Root Valley, for odd and even numbered sections, for fifty years. (See, also, *Northern Pac. Ry. Co.* v. *Hinchman,* 53 Fed. 523; *Northern Pac. Ry. Co.* v. *Maclay,* 61 Fed. 554, 9 C. C. A. 609.) That lands of this character do not come within the limits of grants to railroads is decided in the case of *Leavenworth etc. R. Co.* v. *United States,* 92 U. S. 733, 23 L. Ed. 634 [see, also, Rose's U. S. Notes].

The issuance of a patent by the United States may be inquired into, and if found to have been issued as the result of mistake, or error in construction of the law, may be canceled and the land awarded to the true owner. (*Murray* v. *Montana Lumber & M. Co.,* 25 Mont. 14, 63 Pac. 719; *United States* v. *Stone,* 2 Wall. (U. S.) 525, 17 L. Ed. 765; *Rector* v. *Gibbon,* 111 U. S. 276, 28 L. Ed. 427, 4 Sup. Ct. Rep. 605; *Menotti* v. *Dillon,* 167 U. S. 703, 42 L. Ed. 333, 17 Sup. Ct. Rep. 945; *Huff* v. *Doyle,* 93 U. S. 558, 23 L. Ed. 975; *Black* v. *Jackson,* 177 U. S. 349, 44 L. Ed. 801, 20 Sup. Ct. Rep. 648; *Johnson* v. *Towsley,* 80 U. S. 72, 20 L. Ed. 485 [see, also, Rose's U. S. Notes].)

The case of *Moody* v. *Arthur,* 16 Kan. 419, is almost identical with the case at bar. In that case the court held that the

respondent was entitled to have a decree that the patent be set aside, and the patentee, or his successors in interest, be required to convey to the party holding the receiver's final receipt. (See, also, *Cornelius* v. *Kessel*, 128 U. S. 456, 32 L. Ed. 482, 9 Sup. Ct. Rep. 122 [see, also, Rose's U. S. Notes].)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

This appeal is from a judgment entered in favor of the defendant in an action to quiet title to 154.26 acres of land in Ravalli county.

The plaintiff is the successor in interest of one Travers A. Million, and defendant is the successor in interest of Elmer L. Darling. In May, 1908, Darling, a qualified entryman, settled upon and improved the lands in controversy and thereafter, on December 2 of the same year, made entry in the Land Office at Missoula, produced the required evidence, paid for the lands at the rate of $1.25 per acre and received a receiver's certificate. On October 4, 1912, the commissioner of the general land office canceled the entry solely on the ground that Darling refused to pay an additional amount equal to $1.25 per acre. Later Million was permitted to enter the lands, and upon payment of $2.50 per acre received a patent. At the time plaintiff purchased from Million he had knowledge of the claim asserted by Darling and his successor. The trial court held that Million became vested with the legal title to the lands in trust for the use and benefit of defendant, and that the trust attached to the lands in the hands of plaintiff.

By the Hell Gate Treaty of July 16, 1855 (12 U. S. Stats. [1, 2] 975), practically all of what is now Montana west of the main range of the Rocky Mountains—being then Indian country—was ceded to the United States by the confederated tribes of Flathead, Kootenay and Upper Pend d'Oreille Indians. There was excepted from the grant, however, the territory included in, and by the treaty constituted, the Jocko reservation, which was set apart for the use and benefit of the Indians. Article XI of the treaty contains the following: "It is, more-

over, provided that the Bitter Root Valley, above the Lo-Lo Fork, shall be carefully surveyed and examined, and if it shall prove, in the judgment of the President, to be better adapted to the wants of the Flathead tribe than the general reservation provided for in this treaty, then such portions of it as may be necessary shall be set apart as a separate reservation for the said tribe. No portion of the Bitter Root Valley, above the Lo-Lo Fork, shall be opened to settlement until such examination is had and the decision of the President made known.''

In his proclamation of November 14, 1871, President Grant announced his conclusion that the territory mentioned in Article XI was not better adapted to the wants of the Flathead Indians than was the general reservation, and direction was given for the removal of the Indians from the valley to the reservation and for the opening of the valley lands to settlement as soon as the removal was completed. By the Act of Congress of June 5, 1872 (17 Stat. 226), the effect of the President's proclamation was modified and provision was made again for removal of the Indians to the Jocko reservation, for a survey of the lands of the Bitter Root Valley south of the mouth of the Lo-Lo Fork of the Bitter Root River, and for the disposition of fifteen townships of those lands to qualified entrymen ''in quantities not exceeding 160 acres to each settler at the price of one dollar and twenty-five cents per acre payment to be made in cash,'' *etc.* The other terms of the Act are not material here. Subsequent legislation has amended the statute in certain particulars, but the provision fixing the sale price at $1. 25 per acre has not been changed.

The Act of Congress approved April 24, 1820 (3 Stat. 566), and later Acts which fixed the sale price of public lands were compiled in section 2357, United States Revised Statutes of 1873 and 1878. That section declares that the sale price generally shall be $1.25 per acre, but it also contains this proviso: ''That the price to be paid for the alternate, reserved lands along the line of railroads within the limits granted by any Act of Congress, shall be two dollars and fifty cents per acre.''

The Act of July 2, 1864 (13 Stat. 365), granted to the Northern Pacific Railroad Company (now Northern Pacific Railway Company) every alternate section of public land, not mineral in character, designated by odd numbers, to the amount of twenty alternate sections per mile on each side of the railroad line as adopted by the company through the territory, now state, of Montana, in so far as the United States had full title, not reserved, sold, granted or otherwise appropriated and free from pre-emption or other claims or rights at the time the line of road was definitely fixed and the map thereof filed with the commissioner of the general land office.

The lands in controversy are in the Bitter Root Valley above (south of) the Lo-Lo Fork of the Bitter Root River, are included in the fifteen townships mentioned in the Act of June 5, 1872 (*Hinchman* v. *McClain,* 12 Land Dec. 49), and are within less than forty miles of the line of the Northern Pacific Railway.

With these facts and matters before him, the commissioner of the general land office held that the lands embraced in Darling's entry could not be sold for less than $2.50 per acre. In other words, he held that the sale price of these lands is controlled by the proviso to section 2357, and not by the Act of June 5, 1872.

The land department is a special tribunal created by law for the purpose of determining conflicting claims arising over public land, and its decision upon a question of fact, in the absence of fraud, is conclusive upon the courts (*Thomas* v. *Horst,* 54 Mont. 260, 169 Pac. 731; *Quinby* v. *Conlan,* 104 U. S. 420, 26 L. Ed. 800 [see, also, Rose's U. S. Notes]), but its construction of the law is not binding when called in question in a proper judicial proceeding. (*Shepley* v. *Cowan,* 91 U. S. 330, 23 L. Ed. 424 [see, also, Rose's U. S. Notes]; *Small* v. *Rakestraw,* 28 Mont. 413, 104 Am. St. Rep. 691, 72 Pac. 746; *Love* v. *Flahive,* 33 Mont. 348, 83 Pac. 882.)

The grant to the Northern Pacific was one *in praesenti,* though a survey of the lands and the definite location of the line of

the road were necessary to give precision to it and attach it
to any particular tract (*Leavenworth, L. & G. R. C.* v. *United
States,* 92 U. S. 733, 23 L. Ed. 634 [see, also, Rose's U. S.
Notes].)   At the time the grant was made, the lands in con-
troversy were held, with others, by the general government in
trust, reserved for the use and benefit of the Flathead Indians,
if in the judgment of the President thereafter rendered they
were found to be better adapted to the wants of those Indians
than were the lands on the Jocko reservation.   For this rea-
son none of the lands in the Bitter Root Valley south of the
Lo-Lo passed to the railroad company by the grant (*North-
ern Pac. Ry. Co.* v. *Hinchman,* 53 Fed. 523; *Northern Pac.
R. Co.* v. *Maclay,* 61 Fed. 554, 9 C. C. A. 609; *Bardon* v.
*Northern Pac. Ry. Co.,* 145 U. S. 535, 36 L. Ed. 806, 12 Sup.
Ct. Rep. 856 [see, also, Rose's U. S. Notes]), and this con-
clusion is not affected by the fact that the President thereafter
determined that they should not be devoted to Indian purposes,
but should be subject to entry and sale (*Leavenworth, L. & G.
R. Co.* v. *United States,* above.)   And since the lands did not
pass by the grant and were not affected by it, there were not
any alternate sections or alternate lands in that territory to
which the proviso to section 2357 could apply.

But counsel for appellant relies with confidence upon the
decision of the land department in *Hollensteiner's Case,* 38
Land Dec. 319, wherein it was held that these lands were sub-
ject to sale at a price not less than $2.50 per acre.   The effect
of the decision in that case is that, although these lands did not
pass to the railroad company by reason of the fact that they
were comprised in reserved, Indian country, they are within
the granted limits; "that the fact of the nearness of the rail-
road to the even sections is what enhances their value"; that
the proviso to section 2357 applies to all reserved lands within
the territorial limits of a railroad grant; that the Act of
June 5, 1872, had sole reference to the sale of these lands for
the benefit of the Indians; that the effect of the railroad grant
upon these lands could not have been within the contemplation

of the Congress, and that it was not the purpose in enacting the statute to repeal the proviso to section 2357. The announced conclusion that the proviso applies to all reserved lands is contradictory of its express terms. Neither by direct declaration nor by any fair implication did Congress intimate an intention to fix the sale price of all reserved lands—odd-numbered sections as well as even-numbered ones; on the contrary, the proviso has to do only with *alternate* reserved lands, and the history of the several railroad land grants made prior to 1873, and particularly those grants in aid of the construction of western roads, the line of each of which passed through extensive military and Indian reservations, would indicate that the term *alternate* was used advisedly, and that the legislative purpose was to restrict the price-fixing provision to the alternate sections reserved within given territory which was made subject to the operation of the respective grants. In other words, the double minimum value ($2.50 per acre) was intended to apply only to those sections reserved by the government alternate to the sections granted in aid of railroad construction. Our attention is directed to *United States* v. *Healey,* 160 U. S. 136, 40 L. Ed. 369, 16 Sup. Ct. Rep. 247, and *United States* v. *Ingram,* 172 U. S. 327, 43 L. Ed. 465, 19 Sup. Ct. Rep. 177 [see, also, Rose's U. S. Notes], referred to in the department decision above; but we are unable to find anything in the opinion in either case which militates against the views we have expressed or anything to lend support to the department's conclusion.

But independently of these considerations, the determining [3] factor in the proper construction of the proviso and the Act of 1872 is the character of the Acts themselves. Section 2357 is a general law of uniform application to the sale of public lands throughout the United States, while the Act of June 5, 1872, is a special statute dealing only with the sale price of a particular body of lands—fifteen townships in the Bitter Root Valley lying above the mouth of Lo-Lo Fork. It is the rule of statutory construction in force in this state and

generally elsewhere that, "Where there is one statute dealing with a subject in general and comprehensive terms, and another dealing with a part of the same subject in a more minute and definite way, the two should be read together and harmonized, if possible; but to the extent of any necessary repugnancy between them, the special will prevail over the general statute." (*Stadler* v. *City of Helena,* 46 Mont. 128, 127 Pac. 454.) "Where the special statute is later, it will be regarded as an exception to or qualification of the prior general one." (*Carland* v. *Commissioners,* 5 Mont. 579, 6 Pac. 24; 36 Cyc. 1151; *Cincinnati* v. *Holmes,* 56 Ohio St. 104, 46 N. E. 514.) In principle, if not in express terms, these rules have been applied by the federal courts in many cases. (*State* v. *Stoll,* 17 Wall. (U. S.) 425, 21 L. Ed. 650; *United States* v. *Chase,* 135 U. S. 260, 34 L. Ed. 117, 10 Sup. Ct. Rep. 756; *City of Walla Walla* v. *Walla Walla W. Co.,* 172 U. S. 1, 43 L. Ed. 431, 19 Sup. Ct. Rep. 77; *Kepner* v. *United States,* 195 U. S. 100, 1 Ann. Cas. 655, 49 L. Ed. 114, 24 Sup. Ct. Rep. 797 [see, also, Rose's U. S. Notes]; *Jackson* v. *Chicago, R. I. & P. Ry. Co.,* 178 Fed. 432, 102 C. C. A. 159; *Sweet* v. *United States,* 228 Fed. 421, 143 C. C. A. 3; *Jackson* v. *Cravens,* 238 Fed. 117, 151 C. C. A. 193; *United States* v. *Lapp,* 244 Fed. 377, 157 C. C. A. 3.)

In its present form, section 2357 became effective as of December 1, 1873, but the Act of June 27, 1866 (14 Stat. 74), which authorized the compilation which became the Revised Statutes of 1873, indicates clearly that it was not the intention to enact new statutes, but to bring together, classify and arrange existing laws. The proviso, in substance and practically in form, is found in earlier enactments, so that it may be said in all fairness that the Act of June 5, 1872, represents a later expression of the legislative will than the proviso itself.

There is not any irreconcilable conflict between the two statutes, and consequently there was not a repeal of the earlier Act by the later one. The Act of 1872 removed these fifteen townships from the effect of the general statute—the proviso—

which would have applied if the lands had been within the operation of the Northern Pacific grant. Neither is there anything in the Act of 1872 to indicate that the price-fixing provision had sole reference to the sale of these fifteen townships for the benefit of the Indians. They were to receive but $50,000 from the proceeds of the sales, and that only in installments not exceeding $5,000 per year. Furthermore, the title of the Act would indicate a more general purpose. It is: "An Act to provide for the removal of the Flathead and other Indians from the Bitter Root Valley in the Territory of Montana."

It is, to say the least, something of a serious reflection upon the intelligence of the members of Congress who participated in the legislation to urge that the Act of 1872 was passed without any consideration given to the effect which the Northern Pacific grant might have upon these lands. The granting Act had been passed eight years previously and the line of general route of the road had been fixed on February 21, 1872, four months before and during the very session of Congress which passed the Act on June 5 of that year.

Whatever may have been the inducement to Congress to fix the sale price of these lands at $1.25 per acre, the fact remains that it did so and that there is not any ambiguity or uncertainty in the language employed. We must assume, therefore, that the terms of the Act were intended to convey the meaning which they fairly import. If it was the intention of Congress that the price—$1.25 per acre—should apply only to such of the lands included in the fifteen townships as might fall without the place limits of the Northern Pacific grant or indemnity strip, some appropriate reference to the matter would have been made.

Impelled by these considerations, we hold that the sale price of the lands in controversy was fixed by the Act of June 5, 1872, and that the land department erred in its construction of the law.

When Darling fully complied with the terms of the statute
[4]   applicable to the disposition of these lands, he became
vested with the equitable title and should have received patent.
(*Horsky* v. *Moran,* 21 Mont. 345, 53 Pac. 1064; *Benson M. & S.
Co.* v. *Alta M. & S. Co.,* 145 U. S. 428, 36 L. Ed. 762, 12
Sup. Ct. Rep. 877 [see, also, Rose's U. S. Notes].)   It is the
rule adhered to uniformly that whenever one person has wrong-
fully received patent to lands, which in equity and good con-
science should have been granted to another, the patentee and
those holding under him with knowledge of the facts, will be
converted into trustees of the legal title for the use and benefit
of the equitable owner, and that a court of equity will, in a
proper case, decree that appropriate transfer be made.   (*Mur-
ray* v. *Montana Lumber & M. Co.,* 25 Mont. 14, 63 Pac. 719;
*Love* v. *Flahive,* above.)

We are of the opinion that the trial court reached the cor-
rect conclusion, and accordingly the judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE BRANTLY and ASSOCIATE JUSTICES REY-
NOLDS, COOPER and GALEN concur.

