## SIOUX CITY AND IOWA FALLS TOWN LOT AND LAND COMPANY *v.* GRIFFEY.

ERROR TO THE SUPREME COURT OF THE STATE OF IOWA.

No. 157. Argued January 15, 18, 1892. — Decided February 1, 1892.

The grant of public land to the State of Iowa by the act of May 15, 1856, 11 Stat. 9, c. 28, "in alternate sections to aid in the construction of certain railroads in that State" was a grant *in præsenti*, which did not attach until the time of the filing of the map of definite location; although the beneficiary company (under the Iowa statute) may have surveyed and staked out upon the ground a line for its road before the filing.

The plaintiff, claiming under the said grant to the State of Iowa, brought an action against the defendant to recover a tract, a part of the grant. The defendant claimed under a patent from the United States subsequent to the filing of the map of definite location, but issued on a preëmption claim made prior thereto, and filed a cross bill for quieting his title. *Held*, that it was not open to the plaintiff to contest the *bona fides* of the preëmption settlement.

THE court stated the case as follows:

On May 15, 1856, Congress passed an act granting lands to the State of Iowa to aid in the construction of certain railroads. 11 Stat. 9, c. 28. The grant was a grant *in præsenti*, and of alternate sections, with the familiar provision: " But in case it shall appear that the United States have, when the lines or routes of said roads are definitely fixed, sold any sections, or any parts thereof, granted as aforesaid, or that the right of preëmption has attached to the same, then it shall be lawful for any agent or agents, to be appointed by the governor of said State, to select, subject to the approval of the Secretary of the Interior, from the lands of the United States nearest to the tiers of sections above specified, so much land, in alternate sections, or parts of sections, as shall be equal to such lands as the United States have sold or otherwise appropriated, or to which the rights of preëmption have attached as aforesaid."

By an act of the general assembly of Iowa, of date July 14, 1856, the Dubuque and Pacific Railway Company was made one of the beneficiaries of this grant. By section 6 it was provided: " The lines and routes of the several roads above described shall be definitely fixed and located on or before the first day of April next after the passage of this act, and maps or plats showing such lines or routes shall be filed in the office of the governor of the State of Iowa and also in the office of the secretary of the State of Iowa. It shall be the duty of the governor, after affixing his official signature, to file such map in the department having the control of the public lands in Washington, such location to be considered final only so far as to fix the limits and boundary in which said lands may be selected." The map of the definite location thus provided for was not received by the officers of the State until after September 27, 1856, and was filed at the General Land Office in Washington on October 13, 1856. Prior, however, to the 14th day of July, and the passage of the act making it the beneficiary of the Congressional grant, the Dubuque and Pacific Railroad Company had commenced the survey of its line, and had surveyed and staked out a line upon the surface of the ground along the land in controversy, which by such survey was within the limits of the grant. On the 19th of

July, 1856, Griffey entered upon this land, filed his declaratory statement, and on the 5th of September located it with a military bounty land warrant, and received his certificate of location.

*Mr. W. C. Goudy* for plaintiff in error.

The patent to Griffey was void. There was no authority in the officers of the United States to issue or grant the same. If the former grant to the railroad company was unlawful the only way in which that question could be presented and decided was by a resort to the courts. There was no authority in the executive officers of the government to determine the respective rights of the parties claiming title to the land. The fact that a patent was issued and granted to Griffey is not evidence that it was rightfully issued. And if no further testimony is presented except the acts of Congress, the patents and deeds, a court would be compelled to decide in favor of the elder patent. If this proposition is correct, then the rights of the parties in this litigation must be determined upon the facts presented in evidence without any aid from the patent issued to Griffey. *Ryan* v. *Carter,* 93 U. S. 78; *Whitney* v. *Morrow,* 112 U. S. 693; *Langdeau* v. *Hanes,* 21 Wall. 521; *Moore* v. *Robins,* 96 U. S. 530; *United States* v. *Stone,* 2 Wall. 525; *Hughes* v. *United States,* 4 Wall. 232; *United States* v. *Bell Tel. Co.,* 128 U. S. 315; *United States* v. *Schurz,* 102 U. S. 378; *Bicknell* v. *Comstock,* 113 U. S. 151.

But it is claimed that the issue of the patent to Griffey in 1882 was authorized by an act of Congress of April 21, 1876. 19 Stat. 35, c. 72. The first section of that act is as follows : " Be it enacted by the Senate and House of Representatives of the United States of America, in Congress assembled, that all preëmption and homestead entries, or entries in compliance with any law of the United States, of the public lands, made in good faith by actual settlers, upon tracts of land of not more than one hundred and sixty acres each, within the limits of any land grant, prior to the time when notice of the withdrawal of the lands embraced in such grant was received at the local land office of the district in which such lands are situated, or after

their restoration to market by order of the General Land Office, and where the preëmption and homestead laws have been complied with, and proper proofs thereof have been made by the parties holding such tracts or parcels, they shall be confirmed, and patents for the same shall issue to the parties entitled thereto."

Even if the acts of Griffey came within the language of this act of Congress, it would not be effectual for divesting the title of the elder grantee. It is not in the power of a legislative body to take the title from one person and invest it in another. *Terrett* v. *Taylor*, 9 Cranch, 43.

The alleged preëmption was under the act of 1841. This court has held that the object of that act was to enable actual settlers by residence, who should enter upon the lands in good faith to make it a permanent home, to acquire a prior right to make entry thereof. *Bohall* v. *Dilla*, 114 U. S. 47; *Atherton* v. *Fowler*, 96 U. S. 513.

It is claimed that Griffey entered on the land on the 19th day of July, 1856, and erected a dwelling-house thereon; that he moved into the house on the first or second day of September, 1856, and remained there with his family for three days, when he left the premises and returned to his residence in Sioux City. The testimony of Griffey himself, which was the only evidence offered on the point in this case, shows that he lived with his wife and one or more children in Sioux City; that he had a trading post about two miles south of Sioux City; that he kept a saloon, and also had a license to practice law. In the year 1857, he removed to the west of the Missouri River and never afterwards lived east of that river. It is very clear that he did not comply with the preëmption law.

It follows that the defendants are not entitled to relief in a court of equity, and the decree confirming their title and declaring the title of the plaintiff to be null and void, was erroneous. It is not necessary in this court to cite authorities to sustain the proposition that a party must come into a court of equity with clean hands, and that he must show himself entitled, according to the rules of such a court, to the relief demanded.

If the quarter section of land in controversy was in the United States, and no right of preëmption had attached to the same, it will be conceded that the plaintiff had a good title to it. The question for consideration is, when did the grant vest the title in the State?

The first section of the act of May 15, 1856, granted to the State of Iowa, for the purpose of aiding in the construction of certain railroads mentioned therein, every alternate section of land designated by odd numbers for six sections in width on each side of each of said roads. It is very clear, as has been frequently held, that this is a grant *in præsenti.* There is no condition annexed to it. The act does not require in terms the location of the railroad, nor the filing of any plat showing the route, in any office whatever. The grant is complete and unconditional, subject to the previously acquired rights of purchasers or preëmption settlers.

This court held in *Hastings & Dakota Railroad Co.* v. *Whitney,* 132 U. S. 357, that so long as a homestead entry valid upon its face *remains upon the record* the legality of which has been passed upon the land officers, and their action remains unreversed, it is such an appropriation of the tract as segregates it from the public domain and prevents it from passing by a grant by Congress. It therefore becomes important to inquire whether the facts proven bring this case within the rule laid down in that case. We maintain that the evidence does not show that a right of preëmption had attached to the land in controversy. In discussing this we assume that the grant did not attach to the particular quarter section until the line was located.

The plaintiff's evidence shows the time at which the line of the road was located definitely, the different stations from Dubuque to Sioux City. The map shows that the line of road was located to Independence, Iowa, between July and November 6, 1855; from Independence west to a point near Webster City, between May 30 and June 22, 1856; between Webster City and Fort Dodge, between June 22 and 27, 1856; from Fort Dodge, to a point on section 29, township 88, range 29, between June 27 and June 30, 1856. The map then shows the survey

commenced at Sioux City on the 5th day of July, 1856, and to have been located between that point and the station in section 29, township 88, range 29, between that date and the 5th of August, 1856. It appears, from the map as well as from the testimony, that the line from Sioux City eastward and by the tract of land in controversy was located by the engineer on the 5th day of July, 1856. The road was actually constructed on the route so located, and there has never been any change therefrom.

The Secretary of the Interior, by a letter dated the 4th of February, 1857, asked the opinion of the attorney general as to the construction of the land grant act. The attorney general, by letter of the 16th of February, 1857, gave it as his opinion "that by surveying and marking the lines on the ground those lines are definitely fixed" so as "to give to the State an equitable or inchoate title to the defendant lands, equal in right, at least, to that which any preëmptor gains by commencing actual settlement." This view was adopted by the government. Following it the commissioner vacated and cancelled the alleged entry and preëmption of Griffey. This came to Griffey's knowledge in the month in which it was made, and he took no appeal. The law was thus settled as far as it could be by the executive officers, and there was no decision of any court to the contrary.

It is most earnestly insisted that the construction given to the act of Congress by the executive officers of the government at that time was the correct one.

Several decisions of this court are relied upon to establish the proposition that the title could not pass from the United States and vest in the State of Iowa until the 13th of October, 1856, when the map or plat showing the route was lodged in the General Land Office.

An examination of these opinions will show that in the cases before the court there was an express provision requiring the filing of the map, to make the definite location of the line of route, or that it was made the duty of the government officer to withdraw the lands from market upon filing such a map.

It is sufficient to say that whatever the rule laid down by

these cases, decided since 1865, even if it applies directly to the case now before the court, it will not be allowed to disturb the rules of law established, prior to that time, and according to which the title to the lands had passed from the United States.  This would be more than retroactive legislation.  It would be the establishment of rules by decisions of court, contrary to the rule of *stare decisis*, and having retroactive effect so as to divest title to land, and change the rules of property.

*Mr. S. S. Burdett* (with whom was *Mr. O. C. Treadway* on the brief) for defendants in error.

Mr. Justice Brewer delivered the opinion of the court.

The first and principal question is at what time the title of the railroad company attached, whether at the time the map of definite location was filed in the General Land Office at Washington, or when, prior thereto, its line was surveyed and staked out on the surface of the ground.  While the question in this precise form has never been before this court, yet the question as to the time at which the title attaches, under grants similar to this, has been often presented, and the uniform ruling has been that it attaches at the time of the filing of the map of definite location.  *Grinnell* v. *Railroad Co.*, 103 U. S. 739; *Van Wyck* v. *Knevals*, 106 U. S. 360, 366; *Kansas Pacific Railway Co.* v *Dunmeyer*, 113 U. S. 629, 634; *Walden* v. *Knevals*, 114 U. S. 373; *United States* v. *Missouri, Kansas &c. Railway*, 141 U. S. 358, 375.

In *Van Wyck* v. *Knevals*, where the question arose between Knevals, the grantee of the railroad company, and Van Wyck, who had entered the lands at the local land office after the filing of the map of definite location with the Land Department, but before notice thereof had been received at such local land office, this court said: "The route must be considered as 'definitely fixed' when it has ceased to be the subject of change at the volition of the company.  Until the map is filed with the Secretary of the Interior the company is at

liberty to adopt such a route as it may deem best, after an examination of the ground has disclosed the feasibility and advantages of different lines.   But when a route is adopted by the company, and a map designating it is filed with the Secretary of the Interior and accepted by that officer, the route is established; it is, in the language of the act, 'definitely fixed,' and cannot be the subject of future change, so as to affect the grant, except upon legislative consent."   And in *Pacific Railway Company* v. *Dunmeyer*, it is also said: "We are of opinion, that under this grant, as under many other grants containing the same words, or words to the same purport, the act which fixes the time of definite location is the act of filing the map or plat of this line in the office of the Commissioner of the General Land Office.   The necessity of having certainty in the act fixing this time is obvious.   Up to that time the right of the company to no definite section, or part of section, is fixed.   Until then many rights to the land along which the road finally runs may attach, which will be paramount to that of the company building the road.   After this no such rights can attach, because the right of the company becomes by that act vested.   It is important, therefore, that this act fixing these rights shall be one which is open to inspection.   At the same time it is an act to be done by the company.   The company makes its own preliminary and final surveys by its own officers.   It selects for itself the precise line on which the road is to be built, and it is by law bound to report its action by filing its map with the commissioner, or rather in his office.   The line is then fixed.   The company cannot alter it so as to affect the rights of any other party."

The reasoning of these opinions is applicable here.   The fact that the company has surveyed and staked a line upon the ground does not conclude it.   It may survey and stake many, and finally determine the line upon which it will build by a comparison of the cost and advantages of each; and only when by filing its map it has communicated to the government knowledge of its selected line, is it concluded by its action.   Then, so far as the purposes of the land grant are concerned, is its line definitely fixed; and it cannot thereafter,

without the consent of the government, change that line so as to affect titles accruing thereunder. In accordance with these decisions it must, therefore, be held, that the line was not definitely fixed until the 13th of October, 1856.

Inasmuch as Griffey's preëmption right had attached to this land prior to such time, it did not pass to the railroad company under the grant; and it was a matter of no moment to the company what thereafter became of the title. This is settled by the case of *Pacific Railway Company* v. *Dunmeyer*, in which it was said: "It is not conceivable that Congress intended to place these parties as contestants for the land, with the right in each to require proof from the other of complete performance of its obligation. Least of all is it to be supposed that it was intended to raise up, in antagonism to all the actual settlers on the soil, whom it had invited to its occupation, this great corporation, with an interest to defeat their claims, and to come between them and the government as to the performance of their obligations." And, again: "Of all the words in the English language, this word *attached* was probably the best that could have been used. It did not mean mere settlement, residence or cultivation of the land, but it meant a proceeding in the proper land office, by which the inchoate right to the land was initiated. It meant that by such a proceeding a right of homestead had fastened to that land, which could ripen into a perfect title by future residence and cultivation. With the performance of these conditions the company had nothing to do. The right of the homestead having attached to the land it was excepted out of the grant as much as if in a deed it had been excluded from the conveyance by metes and bounds." See also *Hastings & Dakota Railroad* v. *Whitney*, 132 U. S. 357, in which was a similar ruling.

The only other question we deem important is this: On July 5, 1871, the State of Iowa issued a patent, under which plaintiff in error claims, and on June 30, 1882, the United States issued a patent to Griffey, which is the basis of defendants' title. The defendants filed, as was authorized under the Iowa statute, a cross-petition, praying to quiet their title,

and the decree entered was one dismissing the plaintiff's bill and quieting defendants' title.

Now, it is claimed that Griffey never complied with the preëmption laws; that he never made a *bona fide* settlement; that he secured his preëmption rights by false representations and a pretended settlement; that he does not come into a court of equity with clean hands, and is entitled to no relief; and that, therefore, there was error in entering a decree in favor of the defendants upon the cross-petition. But as we have seen, Griffey did make a settlement, file his declaratory statement and thus initiate a preëmption right. By these means such preëmption right had, in the language of the statute, attached. The land, therefore, did not pass under the railroad grant. It was no matter of interest to the company what became of the title. The government, the owner of the land, was satisfied with what Griffey had done, took from him its land warrant as payment, and patented the land. Into the *bona fides* of this transaction, no one but the government can inquire. As the title was beyond challenge on the part of the railroad company, it had no right to cast a cloud thereupon, and having done so by accepting a patent from the State of Iowa, under the pretence that the land was a part of the grant made to that State, and having affirmed the validity of the title conveyed by such patent, it does not lie in its mouth, or with those claiming under it, to now object to a decree removing all cloud cast by such patent.

We see no error in the rulings of the Supreme Court of Iowa, and its judgment is.

*Affirmed.*