## NOBLE et al. v. OKLAHOMA CITY. HIGGINS et al. v. SAME.

Nos. 23821, 23822.   Feb. 19, 1935.

Rehearing Denied May 7, 1935.

John T. Rogers, Libby & Sherwin, Suits & Disney, Henry L. Goddard, Chas. H. Garnett, and Fred Ptak, for plaintiffs in error.

Harlan T. Deupree, Municipal Counselor, and Stokes, Jarman & Brown, for defendant in error.

OSBORN, V. C. J. George Noble and William Noble, heirs of Naomi Noble, deceased, brought an action in the district court of Oklahoma county against the city of Oklahoma City in ejectment and to quiet title to certain real property. A similar action was filed by Robert W. Higgins, Jr., and others, as heirs of Robert W. Higgins, deceased. The issues of law and fact in the two cases are very similar, if not identical. Such differences as exist will be hereinafter pointed out. The trial court rendered judgment in favor of the defendant in both cases, and plaintiffs appeal. The causes were consolidated in this court. The parties will be referred to as they appeared in the trial court.

The property involved herein is located between First and Second streets in Oklahoma City adjacent to the principal business section of the city. For nearly 40 years the property has been used and occupied as a right of way by the Chicago, Rock Island & Pacific Railway Company and its predecessors. On December 4, 1930, the property was abandoned by the railway company, whereupon this controversy arose.

The land upon which the city of Oklahoma City is now located was opened for settlement by proclamation of the President, pursuant to authority of Congress, on April 22, 1889. In 1890 the Oklahoma Townsite Act was passed by Congress, and thereafter trustees of the townsite of Oklahoma City were approved and the S. E. quarter of section 33, twp. 12 N., R. 3 W., was patented to said trustees for the use and benefit of the occupants of the townsite. Thereafter, the trustees executed a deed to lot 6, in block 36, in Oklahoma City, to Naomi Noble. The plaintiffs, George Noble and William Noble, are the sole heirs of Naomi Noble, now deceased.

Robert W. Higgins, Jr., and the other plaintiffs are the heirs of R. W. Higgins, deceased, who received a homestead patent direct from the government as a settler on the S. W. quarter of section 33, twp. 12 N., R. 3 W.

On February 18, 1888, Congress granted certain rights to the Choctaw Coal & Railway Company (25 Stats. 35). The pertinent provisions giving rise to this controversy are as follows:

"An act to authorize the Choctaw Coal and Railway Company to construct and operate a railway through the Indian Territory, and for other purposes.

"Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Choctaw Coal and Railway Company, a corporation, created under and by virtue of the laws of the state of Minnesota, be, and the same is hereby, invested and empowered with the right of locating, constructing, owning, equipping, operating, using, and maintaining a railway and telegraph and telephone line through the Indian Territory, beginning at a point on Red river (the southern boundary line, at the bluff known as Rocky Cliff in the Indian Territory, and running thence by the most feasible and practicable route through the said Indian Territory to a point on the east boundary line, immediately contiguous to the west boundary line of Polk or Sevier counties in the state of Arkansas; also, a branch line of railway to be constructed from the most suitable point on said line for obtaining a feasible and practicable route in a northwesterly direction to the leased coal veins of said Choctaw Coal and Railway Company in Tobucksey county, Choctaw Nation; with the right to construct, use, and maintain such tracks, turnouts, branches, and sidings and extensions as said company may deem it in their interest to construct along and upon the right of way and depot grounds herein provided for.

"Sec. 2. The said corporation is authorized to take and use for all purposes of railway, and for no other purpose, a right of way one hundred feet in width through said Indian Territory for said main line and branch of the Choctaw Coal and Railway Company; and to take and use a strip of land two hundred feet in width, with a length of three thousand feet, in addition to right of way, for stations, for every ten miles of road, with the right to use such additional ground where there are heavy cuts or fills as may be necessary for the construction and maintenance of the road-bed, not exceeding one hundred feet in width on each side of said right of way, or as much thereof as may be included in said cut or fill: Provided, That no more than said addition of land shall be taken for any one station: Provided, further, That no part of the lands herein authorized to be taken shall be leased or sold by the company, and they shall not be used except in such manner and for such purposes only as shall be necessary for the construction and convenient operation of said railroad, telegraph and telephone lines; and when any portion thereof shall cease to be so used, such portion shall revert to the nation or tribe of Indians from which the same shall be taken.

"Sec. 3. That before said railway shall be constructed through any lands held by individual occupants according to the laws, customs, and usages of any of the Indian nations or tribes through which it may be constructed, full compensation shall be made to such occupants for all property to be taken or damage done by reason of the construction of such railway. In case of failure to make amicable settlement with any occupant such compensation shall be determined by the appraisement of three disinterested referees, to be appointed. * * *

"Sec. 10. That the said Choctaw Coal and Railway Company shall accept this right of way upon the express condition, binding upon itself, its successors and assigns, that they will neither aid, advise, nor assist in any effort looking towards the changing or extinguishing the present tenure of the Indians in their land, and will not attempt to secure from the Indian nations any further grant of land, or its occupancy, than is hereinbefore provided: Provided. That any violation of the condition mentioned in this section shall operate as a forfeiture of all the rights and privileges of said railway company under this act."

On February 13, 1889, the act (section 1) was amended (25 Stats. 668) authorizing the construction of a road from Tobucksey county (near Hartshorne, Pittsburg county) to an intersection with the Atchison, T. & S. F. Railway at the most convenient point between Halifax Station and Ear creek (near the present town of Goodwell).

Thereafter certain other acts were passed extending the time for the construction of the railroad, which are immaterial to the present controversy.

Pursuant to the above acts of Congress, the Choctaw Coal & Railway Company surveyed and located its line, the location crossing the real estate involved herein.

In March, 1905, pursuant to permission of Congress, the Chicago, Rock Island & Pacific Raiway Company became the lessee and assignee of the rights of the Choctaw Coal & Railway Company for a period of 999 years, which company operated the line of railway until December 4, 1930, at which time, by permission, the line of railway on the property herein involved was abandoned and quitclaim deeds were executed by the railway company to the city. On December 5, 1930, an action was instituted in the United States District Court entitled "City of Oklahoma City v. Chicago, Rock Island & Pacific Railway Company and Choctaw,

Oklahoma & Gulf Railway Company," by which it was adjudged and decreed that on December 4, 1930, the railway company had abandoned the right of way and property involved herein and by virtue of an Act of Congress of March 8, 1922 (42 Stat. 414), all the right, title, and interest in and to said property became vested in the defendant city. The plaintiffs were not parties thereto.

Evidence was introduced on behalf of plaintiffs, George Noble and William Noble, showing that on March 28, 1891, Naomi and George Noble executed to the Choctaw Coal & Railway Company a deed to 40 feet off of the north end of lot 6 in block 36, of the city of Oklahoma City, which contained the following reversionary clause:

"Being intended for the use and occupation of said party (grantee), its successors and assigns, as and for its right of way for the constructing, operation, and maintenance of its railroad and business at or upon the land hereby released and quitclaimed: Provided, that in case of abandonment of said premises by said second party, its successors or assigns for the purposes above mentioned, the same shall revert to the grantors, their heirs or assigns."

The property conveyed by the deed is the property involved herein.

On behalf of the Higgins heirs it is shown that on March 24, 1898, a right-of-way deed was executed by R. W. Higgins and wife to the Choctaw, Oklahoma & Gulf Railway Company conveying to said company the property involved herein, which is now claimed by the Higgins heirs, the habendum clause containing the following recital:

"To have and to hold the same by the said Choctaw, Oklahoma & Gulf Railroad Company, together, with all and singular the rights, privileges, and appurtenances thereunto belonging and all the rights and privileges which said company is authorized to have, hold and exercise under and by virtue of the Act of Congress granting the Choctaw Coal & Railway Company a right of way through the Indian Territory, approved February 18, 1888, and subsequent acts of Congress amending and extending said act together with all the rights and privileges granted unto said Choctaw, Oklahoma & Gulf Railroad Company by an Act of Congress approved August 24, 1894, and the Act of Congress approved April 24, 1896, and unto its successors, and assigns forever."

It is further shown that some condemnation proceedings were had in which certain other property was condemned by the railroad company and the damages awarded and paid under the condemnation proceedings. The necessity for the execution of these deeds and the condemnation proceedings arose in the following manner: When the property involved herein was opened for public settlement on April 22, 1889, the right of way of the railroad company was staked off through the townsite and an effort was made to prevent the settlers from staking claims on the right-of-way property. Disputes between the railroad company and the settlers arose over the right-of-way property and the work of construction was delayed. As originally staked off, the right of way took a diagonal course across the townsite. Certain negotiations between the company officials and a citizens committee resulted in a relocation of the right of way running directly through the townsite parallel with the lots. The right of way first staked off was abandoned and a new right of way located in the alley between First and Second streets. It was sought to float a bond issue to secure funds to purchase the right of way for the company, but the project failed when the President vetoed an act of Congress approving the issuance of said bonds. Thereafter other arrangements were made and the necessary funds were secured by the committee of citizens and 40 feet off the south end of the north lots and 40 feet off the north end of the south lots were secured by agreement with the owners either by deed or condemnation, and upon this right of way the railroad lines were constructed.

At the very threshold we are confronted with the nature of the right, privilege, or estate granted by the above-quoted act to the Choctaw Coal & Railway Company, it being contended by defendant that a right of way in the nature of a base or determinable fee, with possibility of reverter in case of nonuser, was granted by said act. But plaintiffs contend that only a franchise was granted to said railway company to acquire a right of way over said lands, and that Congress was without authority to grant more than a mere right to exercise the sovereign power of eminent domain for the reason that at the time of the passage of said act said lands belonged to the Creek Tribe of Indians, or at least that the Creek Tribe of Indians had an interest therein, which Congress was without authority to impair.

We are cited by plaintiffs to a number of treaties between the United States and the Creek Nation dating from January 24, 1826, which by their terms propose to secure and guarantee to the Creek Nation a large domain of land, including the lands in con-

troversy herein, and to cause a patent, should the nation so require, to be executed to said Creek Nation subject to certain conditions. On June 14, 1866, a treaty was entered into between the United States and the Creek Nation with which we are immediately concerned. (14 Stat. 785, 1 Kappler, 931.). By the terms thereof the Creek Nation, for a certain consideration and for certain specified purposes, ceded and conveyed to the United States the west half of said domain (in which the lands involved herein were included) "to be sold to and used as homes for such other civilized Indians as the United States might choose to settle thereon." Article 3. The United States did not have occasion to use said lands for such purposes, and on January 19, 1889, a further treaty was entered into with the Creek Nation whereby said nation ceded and granted to the United States "without reservation or condition full and complete title to the entire western half of the domain * * * and also grants and releases to the United States all and every claim, estate, right, or interest of any and every description in or to any and all land and territory whatever, except. * * *" Said treaty was ratified by the council of the Creek Nation on January 31, 1889, and by the Congress on March 1, 1889. Although the Railway Act above mentioned was passed on February 18, 1888, in any event the United States became invested with full title free from restrictions by the approval of the treaty on March 1, 1889. By Act of Congress of March 2, 1889 (25 Stats. 1004), Congress authorized the opening of said lands for settlement as a part of the public lands, and thereafter by proclamation of the President, dated March 23, 1889, pursuant to Congressional Act, April 22, 1889, at 12:00 o'clock noon was appointed as the time when settlers might exercise certain rights granted under the provisions of the Act of March 2, 1889, to settle upon said lands and eventually to obtain title thereto. The Creek Nation did not complain of the act of Congress in this respect, and by the provisions of the treaty above mentioned said Nation waived all of its rights in and to said lands and ceded and granted such rights to the United States. In this connection it is worthy of note that, by the Act of March 2, 1889, Congress made specific provision that the release and extinguishment of the Indian rights "shall not inure to the benefit of or cause to vest in any railroad company any right, title, or interest whatever in or to any of said land * * * **except rights of way and depot grounds.** * * *" Recognition was thereby given to any rights granted under the Act of February 18, 1888. On February 13, 1889, Congress passed an amendatory act, granting additional rights to said railway company, thereby recognizing the force and effect of their previous enactment. By the Organic Act (26 Stat. 81, approved May 2, 1890) it was again provided, "No part of the land embraced within the territory hereby created shall inure to the use or benefit of any railroad corporation, **except the rights of way and land for stations heretofore granted to certain railroad corporations.**" (Sec. 18.) On February 21, 1891, Congress passed an act extending the time for construction of the road (26 Stats. 765), and on January 22, 1894, a similar act was passed granting a further extension. (28 Stats. 27.)

Plaintiffs rely upon the case of Cherokee Nation v. Southern Kansas Ry. Co., 135 U. S. 641, 34 L. Ed. 295, 10 Sup. Ct. 965. Said case is clearly distinguishable from the case at bar.

With all of the congressional recognition of the rights of the railroad company, both prior and subsequent to the attachment of any rights of plaintiffs, it is clear that plaintiffs, after the lapse of 40 years, cannot claim a want of title in the United States to defeat whatever rights were granted, recognized, and acquiesced in by the Congress, the public, and the predecessors in title of the plaintiffs.

We pass now to a consideration of the nature of the estate granted the railway company by the Act of 1888, supra. But before entering upon said discussion we deem it proper to allude to the surrounding facts and circumstances and the fixed policy of the government relating to the construction of railroads in the vast unoccupied public domain. It had long been the fixed policy of Congress, in recognition of the inestimable aid of an adequate system of transportation to the interior development of the country, to give assistance to the building of railroads through undeveloped territory, not only by granting rights of way without compensation to the government therefor, but also by granting large tracts of public lands not necessary for actual use in the construction, maintenance, and operation of the railroad, which lands could be sold by said railroads to pioneer settlers. That Congress had the undisputed right to dispose of the public lands as it saw fit and proper is well recognized. Ruddy v. Rossi, 248 U. S. 104, 29 S. Ct. 46, 63 L. Ed. 148.

We call attention at this time also to a well-known rule of construction of congressional grants that the acts of Congress by

which said grants are made constitute legislative enactments as well as conveyances of the rights granted, and that such effect must be given thereto as will carry out the legislative intent. In the case of United States v. Southern Pacific Railroad Company, 146 U. S. 570, 36 L. Ed. 1091, 13 S. Ct. 152, it is said:

"Illy as it may accord with the common-law notion of identification of tracts as essential to a valid transfer of title, it is fully settled that we are to construe these acts of Congress as laws as well as grants; that Congress intends no scramble between companies for the grasping of titles by priority of location, but that it is to be regarded as though title passes as of the date of the act, and to the company having priority of grant, and, therefore, that in the eye of the law it is now as though there never was a period of time during which any title to these lands was in the Southern Pacific."

In the case of Missouri, K. & T. R. R. Co. v. Kansas Pac. R. R. Co., 97 U. S. 491, 497, 24 L. Ed. 1095, 1097, it is said:

"It is always to be borne in mind, in construing a congressional grant that the act by which it is made is a law as well as a conveyance, and that such effect must be given to it as will carry out the intent of Congress. That intent should not be defeated by applying to the grant the rules of the common law which are properly applicable only to transfers between private parties. To the validity of such transfers it may be admitted that there must exist a present power of identification of the land; and that where no such power exists, instruments with words of present grant are operative, if at all, only as contracts to convey. But the rules of common law must yield in this, as in all other cases, to the legislative will."

Plaintiffs contend that the act of 1888 did not create a grant in praesenti of a right of way, but merely granted a franchise to the railway company to acquire a right of way by purchase or by condemnation, and that no right or title vested until said right of way had been taken and paid for as provided by the act. Turning our attention to the act itself, we note that by section 1 the railway company is "invested and empowered with the right of locating, constructing, * * * a railway" between fixed termini "by the most feasible and practicable route * * * with the right to construct * * * such tracks * * * upon the right of way and depot grounds herein provided for." By section 2 said corporation "is authorized to take and use for all purposes of railway, and for no other purpose, a right of way 100 feet in width through said Indian Territory. * * *"

The question presented has had much judicial consideration in strikingly similar cases.

In the case of St. Joseph, Denver City R. R. Co. v. Baldwin, 103 U. S. 426, 26 L. Ed. 578, the court was concerned with a controversy arising over a grant to the railroad company of a right of way in the state of Kansas. The act was dated July 23, 1866 (14 Stat. 210). The line of road was not definitely located until October, 1871, and Baldwin acquired his rights in October, 1869. He contended that the company had no vested right to the right of way until the line was located, and the trial court and the state Supreme Court adopted his view. The Supreme Court of the United States, however, took the opposite view, holding as follows:

"The Act of Congress of July 23, 1866, ch. 212, granting to the state of Kansas for the benefit of the St. Joseph & Denver City Railroad Company, the right of way over public lands, is a present absolute grant.

"All persons acquiring any portion of the public lands after the passage of the act in question took the same subject to the right of way conferred by it for the proposed road."

The territorial Supreme Court, at its January, 1896, term decided the case of Churchill v. Choctaw Railway Company, 4 Okla. 462, 46 P. 503. In that case the company claimed a right of way over the property of Churchill by virtue of the grant contained in the Act of 1888, supra. Churchill had made a homestead entry on the land on April 30, 1889. On July 13, 1889, the company filed its map showing the route over Churchill's property. It was sought by injunction to prevent the railway company from entering upon the land without paying compensation. The court followed the Baldwin Case and decided the issues in favor of the railway company. Therein it is said:

"An act of Congress investing and empowering a railway company with the right of way of locating, constructing, owning, equipping, operating, using, and maintaining a railway through and over public land and providing that said company is authorized to take and use for all purposes of a railroad a right of way over said public land is a present absolute grant.

"A homestead settlement subsequent to such an act is subject to the rights of the railway company, although the line of the road was not definitely located until after the entry, and the settler cannot recover for damages necessarily occasioned by the building of the railway under said act."

In Northern Pacific Ry. Co. v. Townsend, 190 U. S. 267, 23 S. Ct. 671, 47 L. Ed. 1044, the court said:

"Following decisions of this court construing grants of rights of way similar in tenor to the grant now being considered (New Mexico v. United States Trust Co., 172 U. S. 171, 19 S. Ct. 128, 43 L. Ed. 407; Railroad Co. v. Baldwin, supra), it must be held that the fee passed by the grant made in section 2 of the Act of July 2, 1864."

The court proceeds to explain the kind of title passed by said grant, and stated that the grant was for a specified purpose, and could not be voluntarily alienated. The court then said:

"The substantial consideration inducing the grant was the perpetual use of the land for the legitimate purposes of the railroad, just as though the land had been conveyed to have and to hold the same so long as it was used for the railroad right of way. In effect, the grant was of a limited fee made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted."

In the case of New Mexico v. United States Trust Co., 172 U. S. 171, 19 S. Ct. 128, 43 L. Ed. 407, the court was dealing with a grant similar to that involved herein. In answering the contention that the grant constituted an easement rather than a fee, it was said:

"But, if it may not be insisted that the fee was granted, surely more than an ordinary easement was granted, one having the attributes of the fee, perpetuity and exclusive use and possession; also the remedies of the fee, and, like it, corporeal, not incorporeal property."

In the case of Rio Grande Western Railway Company v. Stringham, 239 U. S. 44, 36 S. Ct. 5, 60 L. Ed. 136, the court said that the right of way granted by a certain act of Congress is neither a mere easement nor a fee simple absolute, but a limited fee made on an implied condition of reverter in the event that the company ceases to use or retain the land for the purpose for which it is granted, and carries with it the incidents and remedies usually attending the fee, citing New Mexico v. United States Trust Co., 172 U. S. 171, 183; Northern Pac. Ry. Co. v. Townsend, supra; United States v. Michigan, 190 U. S. 379.

Plaintiffs rely on the case of Smith v. Townsend, 148 U. S. 490, 13 S. Ct. 634, 37 L. Ed. 533, where in the body of the opinion it is said that under a certain Act of Congress of July 4, 1884 (23 Stat. 73, ch. 179), there was granted to the Atchison, T. & S.

F. Ry. Company a mere right of way, and the fee continued in the Indians. So far as the immediate controversy is concerned, it is not necessary to direct attention to the specific terms of the congressional grant, it being sufficient to say the question involved in the case was whether or not an employee of the Atchison, T. & S. F. Ry. Company residing on the right-of-way property up to and on the 22nd day of April was thereby disabled from making a homestead entry on a tract of land subject to entry. The nature of the estate of the railway company in and to the right-of-way property was merely incidental to the question before the court, and the discussion in the opinion relating to such issue is dictum. If it could be said that such statement rises to the dignity of an adjudication, it would be contrary to the overwhelming weight of authority. The rule announced in the Baldwin Case and by the territorial Supreme Court is supported by the following federal and state authorities: Stalker v. Oregon Short Line, 225 U. S. 142, 32 S. Ct. 636, 56 L. Ed. 1027; affirming Oregon Short Line R. Co. v. Stalker, 14 Idaho, 362, 94 P. 56; Choctaw, Oklahoma & Gulf Ry. Co. v. Mackey, 256 U. S. 531, 41 S. Ct. 582, 65 L. Ed. 1076; Union Pac. R. R. Co. v. Laramie, Stock Yards Co., 231 U. S. 190, 34 S. Ct. 101, 58 L. Ed. 179; Northern Pac. R. R. Co. v. Ely, 197 U. S. 1, 49 L. Ed. 639; Northern Pac. Ry. Co. v. Hasse, 197 U. S. 9, 25 S. Ct. 305, 49 L. Ed. 642; Jamestown & Northern R. Co. v. Jones, 177 U. S. 125, 20 S. Ct. 568, 44 L. Ed. 698; Noble River L. R. Co., 147 U. S. 165, 13 S. Ct. 271, 37 L. Ed. 123; Denver & R. G. R. Co. v. Alling, 99 U. S. 463, 25 L. Ed. 438; Missouri, K. & T. Ry. Co. v. U. S., 47 Ct. Cl. 59; Missouri, K. & T. Ry. Co. v. Watson, 74 Kan. 494, 87 P. 687; Bowman v. McGoldrick Lmbr. Co. (Idaho) 219 P. 1063; Northern P. Ry. Co. v. Pyle, 19 Idaho, 3, 112 P. 678; Reagan v. Boyd, 59 Mont. 453, 197 P. 832; Northern P. Ry. Co. v. McDonald, 91 Wash. 113, 157 P. 222.

Plaintiffs argue that the language used in the granting clauses of some of the above acts is substantially different from the language used in the Act of 1887, that the words "take and use" are peculiar to the act involved herein and are indicative of a purpose to grant only the right to acquire a right of way. The court in the case of Churchill v. Choctaw Railway Co., supra, adopted the view contrary to plaintiffs' contention and approved the rule announced in the various cases herein quoted. It plainly appears that there was a legislative intent to make an absolute grant of a right of way. Subsequent legislation on the subject

after the land was acquired by the United States in fee simple recognized the existence of a previous grant. We are impelled to conclude that the territorial Supreme Court arrived at a correct conclusion as to the nature of the estate granted by the act under consideration.

Having determined that a grant in praesenti was made by the act under consideration, we are confronted with the relative rights of the railroad company and settlers upon the public domain prior to the actual location of the railroad on the granted lands. This question has been set at rest, however, by the Supreme Court of the United States in the case of St. Joseph & Denver City Railroad Co. v. Baldwin, supra, wherein the distinction is noted between the grant of a right of way and the grant of lands in aid of construction. Therein it is said:

"The right of way for the whole distance of the proposed route was a very important part of the aid given. If the company could be compelled to purchase its way over any section that might be occupied in advance of its location, very serious obstacles would be often imposed to the progress of the road. For any loss of lands by settlement or reservation other lands are given, but for the loss of the right of way by these means, no compensation is provided, nor could any be given by the substitution of another route.

"The uncertainty as to the ultimate location of the line of the road is recognized throughout the act, and where any qualification is intended in the operation of the grant of lands, from this circumstance, it is designated. Had a similar qualification upon the absolute grant of the right of way been intended, it can hardly be doubted that it would have been expressed. The fact that none is expressed, is conclusive that none exists.

"We see no reason, therefore, for not giving to the words of present grant, with respect to the right of way, the same construction which we should be compelled to give, according to our repeated decisions, to the grant of lands had no limitation been expressed. We are of opinion, therefore, that all persons acquiring any portion of the public lands, after the passage of the act in question, took the same subject to the right of way conferred by it for the proposed road."

The above case was quoted from and followed by the Supreme Court of the United States in the later case of Bybee v. Oregon & Cal. Ry. Co. (1890) 139 U. S. 663, 11 S. Ct. 641, 35 L. Ed. 305, and Nadeau v. Union Pac. R. R. Co. (1920) 253 U. S. 442, 40 S. Ct. 570, 64 L. Ed. 1003. See, also, Northern

Pac. R. R. Co. v. Ely, 197 U. S. 1, 25 S. Ct. 302, 49 L. Ed. 639; Northern Pac. R. R. Co. v. Hasse, 197 U. S. 9, 25 S. Ct. 305, 49 L. Ed. 642; North Chicago St. Ry. Co. v. Chicago Union Traction Co., 150 Fed. 612; Stuart v. Union Pacific Ry. Co., 178 Fed. 753; Id., 227 U. S. 342, 33 S. Ct. 338, 57 L Ed. 535.

It is conceded that upon abandonment by the railroad company its title terminated. We must determine, however, whether or not the reverter inured to the United States or passed by the government patent issued to plaintiff's predecessors. In this connection we direct attention to the recognized rule of construction of the title granted by patents issued by the officials of the government pursuant to congressional authority. No official can transcend the congressional authority pursuant to which such patent is issued, and every such patent must find unmistakable authority from Congress to dispose of the right or estate attempted to be conveyed. This is an important rule of construction, oft pronounced and uniformly recognized. If said interests in the public domain have been withdrawn by congressional act from the operation of subsequent enactments, no act of any official, of whatever rank, is effective to override the congressional limitation.

The rule announced in the early history of our jurisprudence in the ancient case of Wilcox v. Jackson, 13 Pet. 498, wherein the court said:

"Whenever a tract of land shall have once been legally appropriated to any purpose, from that moment the land thus appropriated becomes severed from the mass of public lands; and no subsequent law, or proclamation, or sale, would be construed to embrace it, or to operate upon it, although no reservation were made of it."

In Leavenworth, Lawrence & Galveston Ry. Co. v. United States, 92 U. S. 733, 23 L. Ed. 634, the Supreme Court of the United States had under consideration a grant of lands to the state of Kansas in alternate sections. Prior to said grant certain lands were occupied by the Osage Indians under a treaty previously entered into with the United States, The Governor of the state of Kansas, construing the wording of the grant as broad enough to include alternate sections of land, issued patents thereto regardless of the occupancy by the Osage Indians, whereupon the government instituted suit to cancel said patents as to lands so occupied. In the body of the opinion the court said:

"The main question in Dubuque & P. R.

Co. v. Litchfield, 23 How. 66, 16 L. Ed. 500, was whether a grant to the territory of Iowa, to aid in the improvement of the navigation of the Des Moines river, extended to lands above the Raccoon fork, or was confined to those below it, the court, in deciding it, says: 'All grants of this description are strictly construed against the grantee; nothing passes but what is conveyed in clear and explicit language; and as the rights here claimed are derived entirely from the act of Congress, the donation stands upon the same footing of a grant by the public to a private company, the terms of which must be plainly expressed in the statute, and, if not thus expressed, they cannot be implied.'

"This grant, like that to Iowa, was made for the purpose of aiding a work of internal improvement, and does not extend beyond the intent it expresses. It should be neither enlarged by ingenious reasoning nor diminished by strained construction. The interpretation must be reasonable and such as will give effect to the intention of Congress. This is to be ascertained from the terms employed, the situation of the parties, and the nature of the grant. If these terms are plain and unambiguous, there can be no difficulty in interpreting them; but if they admit of different meanings—the one of extension, and the other of limitation—they must be accepted in a sense favorable to the grantor. And if right claimed under the government be set up against it, they must be so clearly defined that there can be no question of the purpose of Congress to confer them. In other words, what is not given expressly, or by necessary implication, is withheld. * * *

"Only the public lands owned absolutely by the United States are subject to survey and division into sections, and to them alone this grant is applicable. It embraces such as could be sold and enjoyed, and not those which the Indians, pursuant to treaty stipulations, were left free to occupy. * * *

"And such grants could be treated in no other way, for Congress cannot be supposed to have thereby intended to include land previously appropriated to another purpose, unless there be an express declaration to that effect. A special exception of it was not necessary, because the policy which dictated them confined them to lands which Congress could rightfully bestow, without disturbing existing relations and producing vexatious conflicts. The legislation which reserved them for any purpose excluded it from disposal as the public lands are usually disposed of. * * *

" 'A thing which is within the letter of the statute is not within the statute unless it be within the intention of the makers. * * *

"Every tract set apart for some special uses is reserved to the government to enable it to enforce them. There is no difference, in this respect, whether it be appropriated for Indian, or for other purposes. There is an equal obligation resting on the government to see that neither class of reservations is diverted from the uses to which it was assigned."

In St. Louis Smelting, etc., Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875, the court said:

"Of course, when we speak of the conclusive presumptions attending a patent for lands, we assume that it was issued in a case where the department had jurisdiction to act and exercise it; that is to say, in a case where the land belonged to the United States, and provision had been made by law for their sale. If they never were public property, or had previously been disposed of, or if Congress had made no provision for their sale, or had reserved them, the department would have no jurisdiction to transfer them, and its attempted conveyance of them would be inoperative and void, no matter with what seeming regularity the forms of law may have been observed."

In the case of Burfenning v. Chicago, St. Paul, etc., Ry. Co., 163 U. S. 321, 16 S. Ct. 1018, 41 L. Ed. 175, Mr. Justice Brewer said:

"It has undoubtedly been affirmed over and over again that, in the administration of the public land system of the United States, questions of fact are for the consideration and judgment of the Land Department, and that its judgment thereon is final. Whether, for instance, a certain tract is swamp land or not, saline land or not, mineral land or not, presents a question of fact not resting on record, dependent on oral testimony, and it cannot be doubted that the decision of the Land Department, one way or the other, in reference to these questions, is conclusive and not open to relitigation in the courts, except in those cases of fraud, etc., which permit any determination to be re-examined. Johnson v. Towsley, 13 Wall. (U. S.) 72, 20 L. Ed. 485; Smelting Co. v. Kemp, 106 U. S. 447, 1 S. Ct. 389, 27 L. Ed. 226; Wright v. Roseberry, 121 U. S. 488, 7 S. Ct. 985, 30 L. Ed. 1039; Heath v. Wallace, 138 U. S. 573, 11 S. Ct. 380, 34 L. Ed. 1063; McCormick v. Hayes, 159 U. S. 332, 16 S. Ct. 37, 40 L. Ed. 171. But it is also equally true that, when by act of Congress a tract of land has been reserved from homestead and pre-emption, or dedicated to any special purpose, proceedings in the Land Department in defiance of such reservation or dedication, although culminating in a patent, transfer no title, and may be challenged in an action at law. In other words, the action of the Land Department cannot override the expressed will of Congress, or convey away public lands in disregard or defiance thereof. Smelting Co. v. Kemp, 104 U. S. 636, 26 L. Ed. 875; Wright v. Roseberry, supra; Doolan v. Carr, 125 U. S.

618, 8 S. Ct. 1228, 31 L. Ed. 844; Davis, Adm'r, v. Weibbold, 139 U. S. 507, 529, 11 S. Ct. 628, 35 L. Ed. 238; Knight v. U. S. Land Ass'n, 142 U. S. 161, 12 S. Ct. 258, 35 L. Ed. 974."

The doctrine announced in the Wilcox v. Jackson Case, supra, has been widely quoted and followed: Witherspoon v. Duncan, 4 Wall. 210, 218; Chotard v. Pope, 12 Wheat. (U. S.) 586; Carroll v. Safford, 3 How. (U. S.) 441; Buttz v. Northern Pac. Ry. Co., 119 U. S. 55; Kansas, Pac. Ry. Co. v. Dunmeyer, 113 U. S. 629; Hastings & Dakota Ry. Co. v. Whitney, 132 U. S. 357; Whitney v. Taylor, 158 U. S. 85, 15 S. Ct. 796, 39 L. Ed. 906; Sioux City & Iowa Falls Land Co. v. Griffey, 143 U. S. 32, 12 S. Ct. 362, 36 L. Ed. 64; United States v. Southern Pac. Ry. Co., 146 U. S. 570, 13 S. Ct. 152, 36 L. Ed. 1091; Northern Pac. R. R. Co. v. Trodick, 221 U. S. 208, 31 S. Ct. 607, 55 L. Ed. 704; Tarpey v. Madsen, 178 U. S. 215, 20 S. Ct. 849, 44 L. Ed. 1042; St. Paul, Minnesota & Manitoba Ry. Co. v. Donahue, 210 U. S. 21, 28 S. Ct. 600. See the following cases from the territorial Supreme Court: Enid & Anadarko Ry. Co. v. Kephart, 19 Okla. 1, 91 P. 1049; McMichael v. Murphy, 12 Okla. 155, 70 P. 189; Hodges v. Colcord, 12 Okla. 313, 70 P. 383; Holt v. Murphy, 15 Okla. 12, 79 P. 265. See the following decisions from the Land Department: Whitney v. Maxwell, 2 Land Dec. Dept. Int. 98; Schrotberger v. Arnold, 6 Land Dec. Dept. Int. 425; Allen v. Curtiss, 7 Land Dec. Dept. Int. 444; Faulker v. Miller, 16 Land Dec. Dept. Int. 130.

Much litigation has had the attention of the state courts and the federal courts, including the Supreme Court of the United States, relating to the obtaining of title by individuals to land granted by Congress to railroad companies for right of way from said railroad companies either by voluntary conveyance or by adverse user for such length of time as under the state law title arose by prescription. A great contrariety of conflicting decisions ensued in the various states. Said question was set at rest in 1898 by the Supreme Court of the United States in the case of Northern Pac. R. R. Co. v. Smith, 171 U. S. 260, 18 S. Ct. 794, 43 L. Ed. 157, which case was followed by the case of Northern Pacific Ry. Co. v. Townsend, 190 U. S. 267, wherein the court used the following language:

"Nor can it be rightfully contended that the portion of the right of way appropriated was not necessary for the execution of the powers conferred by Congress, for, as said in Northern Pacific R. R. Co. v. Smith, 171 U. S. 261, 275, speaking of the very grant under consideration: 'By granting a right of way four hundred feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance.' Neither courts nor juries, therefore, nor the general public, may be permitted to conjecture that a portion of such right of way is no longer needed for the use of the railroad and title to it has vested in whomsoever chooses to occupy the same. The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, as against a claim by an individual of an exclusive right of possession for private purposes.

"To repeat, the right of way was given in order that the obligations to the United States assumed in the acceptance of the act might be performed. Congress having plainly manifested its intention that the title to and possession of the right of way should continue in the original grantee, its successors and assigns, so long as the railroad was maintained, the possession by individuals of portions of the right of way cannot be treated without overthrowing the act of Congress as forming the basis of an adverse possession which may ripen into a title good as against the railroad company."

It will thus be seen that the judicial construction given to the various acts granting rights of way to railroad companies recognized a public use and proprietary interest on the part of the government of the United States in the character of title remaining in said land which had been granted for right of way purposes to the various railroads. By many enactments unnecessary to delineate more specifically herein. Congress had assumed to exercise a certain limited control over said lands which had been conveyed or which had not been actually used for right-of-way purposes culminating in the passage of the Act of Congress of April 28, 1904 (33 Stats. 538), of May 25, 1920 (41 Stat. 621), and of March 8, 1922 (42 Stats. 414), which latter act will be hereinbefore referred to.

As heretofore pointed out, the various acts relating to the opening of the country for settlement and the proclamation of the President specifically recognize prior grants for rights of way and depot grounds to railroad companies. The judicial and legislative constructions were numerous and well established as to other grants of right of way. By section 2 of the act, supra, it was provided that when any portion of the lands so granted ceased to be used for railway purposes, the same should revert to the nation or tribe of Indians from which same was taken. The United States succeeded

to all the rights of the Creek Nation by treaty. We have searched in vain to find express authority granted to any government official authorized to issue patents to convey to the homestead settler this right of reverter to the United States, and under the well-established judicial decisions we are not at liberty to imply such power and authority. We therefore conclude that the right of reverter under the act under consideration in this case inured to the benefit of the United States and not to the patentee of lands under the various homestead and pre-emption acts of Congress.

It is contended by plaintiffs, however, that the railroad company abandoned a portion of its right of way as granted by Congress under the Act of 1888, and substituted in lieu thereof a purchased right of way over lands of plaintiffs' predecessors, and that having accepted right-of-way deeds from plaintiffs' predecessors, the railroad company and its successors in title, the city, are estopped from asserting an adverse title to the title of plaintiffs. In this connection the record discloses that the railroad company made a survey of its proposed route diagonally through the section of land wherein the lands involved herein are located. A map of said location was filed with the Secretary of the Interior on July 13, 1889, and approved by him. The plaintiffs assert that their rights had their inception in occupancy on April 22, 1889. It is asserted by defendant city in its brief, and not denied by plaintiffs, that all of the lands involved herein granted by the Noble heirs were in fact embraced in the original survey; but it is conceded that as to the Higgins heirs, although the preliminary survey crossed the quarter section of land eventually patented to their ancestor, the identical strip of land involved herein was not embraced within the original survey nor shown on said approved map.

In discussing the question, we turn to the act itself to analyze some of its provisions. By section 3, quoted, supra, the railroad company is required to make full compensation to "individual occupants according to the laws, customs and usages of any of the Indian Nations or Tribes * * * for all property to be taken or damage done by reason of the construction of such railway." In case of controversy over said compensation a form of condemnation proceedings is provided by said act. By section 5, said railroad company is required to pay to the Secretary of the Interior for the benefit of the particular nations or tribes through whose lands the railroad may be located the sum of $50 for each mile of railroad and a further sum of $15 per mile per annum, required as rental to be paid in like manner to said tribe during the continuance of the Indian title. Compensation for any others than those designated is not provided for, and such compensation is therefore withheld. Section 6 of the act provides:

"That said company shall cause maps showing the route of its located lines through said territory to be filed in the office of the Secretary of the Interior, and also to be filed in the office of the principal chief of each of the nations or tribes through whose lands said railway may be located; and after the filing of said maps no claim for a subsequent settlement and improvement upon the right of way shown by said maps shall be valid as against said company; Provided, That when a map showing any portion of said railway company's located line is filed as herein provided for, said company shall commence grading said located line within six months thereafter, or such location shall be void; and said location shall be approved by the Secretary of the Interior in sections of twenty-five miles before construction of any such section shall be begun."

The purpose of filing said map and the right of the railroad company under the act of 1888 to construct its line between the fixed termini along the most feasible and practicable route had judicial consideration in the early case of United States ex rel. Search et al. v. Choctaw, Oklahoma & Gulf Ry. Co., 3 Okla. 404, 41 P. 729. Mr. Justice McAtee, on behalf of the court, prepared a very lengthy and exhaustive opinion wherein the authority of the Secretary of the Interior in approving the map and its effects upon the rights of the railroad company were discussed at length. The facts giving rise to said discussion were that the railroad company filed a map showing the location of its line of railroad near the town of Tecumseh, which map was duly approved. Thereafter the company determined to change said route, locating same through what is now the site of the city of Shawnee. Pursuant to said change the company filed another map with the Secretary of the Interior showing said change, which map the Secretary of the Interior declined to approve. Relating thereto, the court said:

"No conditions precedent to the right to build the road are to be found in the Act of 1888 and those which follow it, except such as provided for the protection of the Indians, or granted authority to the railroad company. The railroad company, then, accepted the grant upon the conditions therein provided, and no others. It had the right

---

to rely upon the grant of powers made to it, upon condition only that it should fulfill and comply with the precedent conditions upon which the powers were granted.

"The company, having accepted the conditions upon which it was provided that it might build its line in the Indian Territory, and having entered upon its location and construction, had a right to locate and construct its line without the imposition of further conditions. Congress itself would have no right to impose them, unless it should undertake to do so under the power, reserved in the act itself, 'to amend, add to, alter, or repeal this act,' a reservation of authority which does not exist in the Secretary of the Interior. * * *

"We, therefore, hold that the Choctaw, Oklahoma & Gulf Railway Company was authorized by the Acts of 1888, and 1894, to locate its own line through the section of country wherein 'section 4' is built, and has located its line by the most feasible and practicable route, and inasmuch as the rights of location and construction were dependent only upon the performance of the conditions set forth in the act, and these conditions were for the protection of the Indian tribes and nations or of Indian occupants under the laws, customs and usages of the Indian tribes or nations, and that the defendant company has fully complied with the conditions, that the defendant company is invested and empowered with the right to locate and construct its lines, and to the approval of the Secretary of the Interior therefor, and that, the Indian interests having been extinguished, the land became subject to the laws of the territory of Oklahoma, without the intervention of the limitations of the Indian Intercourse Act, and that the defendant company, having complied with the provisions of the laws of this territory authorizing the laying out and construction of railways, is entitled to locate and construct its lines thereunder. * * *"

We are convinced that the viewpoint of the territorial Supreme Court as to the requirements of the filing of said map is correct. Clearly it was not the intention of Congress that the making of a survey, or the filing of maps thereof, through the vast unsettled public domain should operate as an irrevocable or final location of the route of said railroad. A definite location may be fixed by construction of the road. Jamestown & Northern Ry. Co. v. Jones, 177 U. S. 125, 44 L. Ed. 598; Stuart v. Union Pac. R. R. Co., 227 U. S. 342, 33 S. Ct. 338, 57 L. Ed. 535. The duty was enjoined on the company to construct its road along the "most feasible and practicable route." Serious difficulties were confronted on every hand; homeseeking immigrants ignored the staked and guarded right of way claimed in a diagonal direction through the land sought to be settled by them as a townsite; bitter controversy ensued and in the newly organized tribunals the assertion of the rights of the company by litigation, by delay alone, would cause the forfeiture of the franchise conferred upon it and of the grant made to it by Congress to carry out its farsighted policy of furnishing a means of transportation to those who had cast their fortunes in the newly opened and unsettled domain. At the time of the passage of the Act of 1888, and prior to April 22, 1889, every person, except those specifically recognized by the government, no matter how long his occupation or how large his improvements, was a trespasser and could maintain no right of possession against the United States or its grantees. And the company having been granted an estate in praesenti, of which all persons were bound to take notice, these numerous settlers, by adverse claims of occupancy, could not hinder, frustrate, and effectively thwart the declared policy of the government in granting a free right of way to a company to whom it had delegated the privilege, and which had accepted the duty, of constructing and operating a railroad through the public domain.

The right of the railroad company to said right of way was not predicated upon a condition precedent that a map should be filed showing the exact location of said railroad, nor was there a condition subsequent attached to said grant that in the event a map was not filed and approved, the grant of right of way should become forfeited or void. The attendant benefit was specifically stated in the act that "after the filing of said maps no claim for a subsequent settlement and improvement upon the right of way shown by said map shall be valid as against the said company," referring, of course, to the "individual occupants according to the laws, customs, and usages of any of the Indian nations or tribes." Unless the company commenced grading said located land within six months after the filing of the map, the act provides that "such location shall be void," and provision is made that the Secretary of the Interior shall approve the said location in sections of 25 miles before construction shall begin on such sections.

We must conclude that without the filing of a map prior to the actual construction of the railroad the company had a right to change its location to conform to "the most

feasible and practicable route," and that by the filing of the map before construction of the railroad the company was not irrevocably precluded from selecting another route which it determined to be more feasible and practicable under the conditions confronting it. Stuart v. Union Pacific R. R. Co., 227 U. S. 342, 33 S. Ct. 338, 57 L. Ed. 535; Nielsen v. Northern Pac. R. R. Co. (C. C. A.) 184 Fed. 601; Nadeau v. Union Pac. R. R. Co., supra.

On April 24, 1896, a congressional act (29 Stat. 98) was passed relating to the railroad line with which we are dealing, which in part provides:

"Section 3. That the line of railroad which has been heretofore constructed shall be regarded and treated as a full compliance by said company with the requirements of the act applicable to it, by which it was required as a condition of further construction thereafter to complete its main line prior to February 18, 1896, and said company may exercise from time to time the rights, powers, and franchises heretofore or by this act conferred as to further extensions of or branches from its existing line."

The above constitutes a congressional approval of the location of the road on the route which was finally selected. We therefore conclude that the right of way was definitely located by construction of the railroad line, and the grant thereof related back to the date of the act, and since the rights of plaintiffs' predecessors in title were acquired with notice of the rights of the railroad company previously granted, subject to the definite location of the right of way, they had no title to the land itself to convey at the time the right-of-way deeds were executed by them to the company. By the deeds they simply waived their claim of possession.

Plaintiffs contend, however, that by the acceptance of the deeds hereinabove mentioned, the railroad company, and its successors in interest, the city, are estopped from denying the title of plaintiffs' predecessors to the tracts of land in controversy. This claim of plaintiffs overlooks, however, that the title of the railroad company was extinguished by abandonment and that the right of reverter inured to the benefit of the United States and that by Act of Congress dated March 8, 1922 (42 Stats. 414), the United States invested in the city the title to said property by specific grant for certain purposes as set forth in said act. There can be no estoppel as against the United States arising by reason of the individual acts or contracts of individuals. The title

of the city is deraigned from the government and not from the railroad company, nor from the predecessors of plaintiffs.

The reversion clause in the Noble deed purported · to contract with reference to a right retained by the United States government, and was therefore wholly ineffective. We point out also that in the Higgins deed the deed expressly recognized the rights of the company under the Act of 1888, and subsequent acts, which right we have determined hereinabove to be superior to the claim of the Higgins heirs. We conclude that upon abandonment by the railroad company, and the judicial determination thereof, as hereinabove set forth, the city became invested with the title to the tracts of land in controversy subject to the provisions of Congress by the Act of March 8, 1933 (42 Stats. 414).

McNEILL, C. J., and RILEY, BAYLESS, BUSBY, WELCH, CORN, and GIBSON, JJ., concur. PHELPS, J., not participating.